Opinion
 

 COTTLE, P. J.
 

 In this case we determine that appellant Tony Anchundo, the Monterey County Registrar of Voters (Registrar), correctly certified that a referendum petition contained insufficient signatures for placement on the ballot. Under the particular circumstances of this case, however, we hold that the controversy has become moot by virtue of the intervening election, and deny the request of Rancho San Carlos Partnership (RSC) to treat the election as a nullity. The appeal from the judgment is therefore dismissed. We reverse the trial court’s order awarding attorney fees.
 

 I. Factual and Procedural Background
 

 The facts of this case are essentially undisputed. On February 6, 1996, the Monterey County Board of Supervisors (Board of Supervisors) adopted Ordinance No. 03857, entitled “An Ordinance Amending Title 21 of the Monterey County Code to Reclassify Certain Properties in the County of Monterey” (Ordinance). The Ordinance adopts certain rezoning for portions
 
 *253
 
 of the property commonly known as Rancho San Carlos.
 
 [1]
 
 In response to the Board of Supervisors’ action, a referendum petition was circulated in Monterey County protesting the adoption of the Ordinance.
 

 The referendum petition, which contained 1,581 sections and 11,873 signatures, was presented to the Clerk to the Monterey County Board of Supervisors (hereafter Clerk). The Clerk delivered the petition to the Registrar for the purpose of determining whether the petition had been signed by the statutorily required number of registered voters. After the deadline for turning in the referendum petition, additional sections containing 163 signatures were presented to the Clerk.
 

 The Registrar and his staff examined the signatures on the petition sections which had been timely presented to the Clerk and determined that the petition contained 8,884 valid signatures and 2,989 invalid signatures. On April 18, 1996, the Registrar issued a certificate stating, in. part: (1) that “[p]ursuant to California Elections Code section 9144, in order to be sufficient, the petition must have been signed by 9,197 qualified registered voters of Monterey County, that number being equal to ten percent of the total vote cast for Governor in this county at the last gubernatorial election”; and (2) that the referendum petition (with 8,884 valid signatures) was insufficient by 313 signatures. This litigation followed.
 

 On April 19, 1996, respondent Noel Oard Mapstead, one of the proponents of the referendum petition, filed a verified petition for writ of mandate, alleging that the Registrar had acted arbitrarily and capriciously, had abused his discretion, and had failed to perform his ministerial duty by refusing to count as valid eight categories
 
 [2]
 
 of signatures on the referendum petition, totaling six hundred thirty-one signatures. In a verified answer, the Registrar admitted that he had not counted the signatures as valid, but denied that he had acted arbitrarily or capriciously, abused his discretion, or failed to perform his ministerial duty.
 

 On May 29, 1996, RSC, the owner of certain property being rezoned by the Ordinance, filed a motion to intervene in the action. RSC later sought access to the referendum petition subject to protective orders. The trial court deferred these motions.
 

 
 *254
 
 On July 18, 1996, the Registrar filed a notice of motion to deny the writ of mandate requested by Mapstead. The motion was accompanied by a memorandum of points and authorities, the Registrar’s certification that the petition lacked sufficient valid signatures, the Registrar’s declaration, and accompanying evidentiary exhibits. The Registrar’s declaration was later supplemented and additional evidentiary exhibits were included.
 

 On July 26, 1996, the trial court granted Mapstead’s motion to relieve Alexander T. Henson as his counsel, and permitted Mapstead to represent himself. On July 29, 1996, the court granted the motion of Holly Keifer, another proponent of the referendum petition represented by Alexander T. Henson, to intervene. The court also granted RSC’s motion to intervene, which had earlier been deferred, but continued to bar RSC from access to the referendum petition.
 

 Keifer filed a verified complaint in intervention against the Registrar. Keifer’s petition paralleled Mapstead’s earlier petition, but challenged additional categories of signatures. Mapstead amended his petition to challenge, among other things, the Registrar’s refusal to count the 163 signatures which had been presented to the Clerk after the deadline for submitting the referendum petition. Keifer’s intervention and Mapstead’s amendment increased the total number of signatures alleged to have been improperly invalidated by the Registrar from 631 to 919.
 

 On August 8, 20, and 21, 1996, the case was heard by the trial court without a jury on the basis of written declarations, briefs, and extensive oral argument. During the course of the trial, Mapstead and Keifer were allowed to amend their petitions to challenge the Registrar’s determination with respect to an additional 2,004 signatures, raising the total number of signatures at issue from 919 to 2,923. Both the Registrar and RSC requested a written statement of decision.
 

 During the course of the hearing, the Registrar determined that he had improperly invalidated 58 signatures which should have been counted as valid. This had the effect of raising the total number of valid signatures on the referendum petition from 8,884 to 8,942 signatures, and making the petition insufficient by 255 valid signatures.
 

 At the conclusion of the hearing on August 21, 1996, the court determined that the Registrar should have counted 367 additional signatures as valid (in addition to the 58 signatures the Registrar had determined to be valid during the hearing). These 425 signatures caused the referendum petition (with 9,309 signatures) to be sufficient by 112 signatures. The court directed
 
 *255
 
 counsel for Keifer to prepare the statement of decision. The court then ordered that the referendum be placed on the ballot for the election on November 5, 1996.
 

 On or about August 22, 1996, RSC, joined by the Registrar, filed a petition for writ of mandate and request for stay as to the trial court’s order issued orally at the conclusion of the proceedings on August 21, 1996. On August 30, 1996, this court denied the petition for writ of mandate and the request for stay.
 

 On August 27, 1996, Mapstead filed an ex parte motion to reconsider placing the referendum on the November 5 ballot. The motion was denied, subject to being granted if the case were remanded by this court to the trial court. On August 29, 1996, Mapstead also filed a motion to vacate the judgment and enter a different judgment, which was denied as premature. Mapstead also filed a “notice of appeal of portion of judgment & other nonappealable orders,” which was subsequently abandoned.
 

 On or about August 30, 1996, Mapstead filed a petition in this court for writ of supersedeas or other appropriate stay order. On September 6, 1996, this court denied, without opinion, the petition for writ of supersedeas and the request for stay.
 

 On September 6, 1996, the Board of Supervisors adopted a resolution not to repeal the Ordinance, and determined that the Ordinance should be submitted to the voters at the general election to be held on November 5, 1996.
 
 [3]
 

 The referendum election was conducted on November 5, 1996. In the election, the Ordinance was rejected by the electorate by a vote of 55.1 percent to 44.9 percent.
 

 Despite objections by the Registrar and RSC, the trial court signed an “Amended Revised Statement of Decision” on November 22, 1996. The judgment was entered on December 4, 1996. On the same date, the court awarded attorney fees against the Registrar and RSC pursuant to section 1021.5 of the Code of Civil Procedure. On December 18, 1996, the judgment. was amended to specify the correct amount of attorney fees awarded to Henson ($80,937.50), paralegal fees awarded to Keifer ($7,948) and costs ($2,518.88). The order provides that the Registrar in his official capacity and RSC are jointly and severally liable for the award of costs and attorney fees.
 

 
 *256
 
 Following notice of entry of judgment, the Registrar and RSC appealed.
 

 II. Discussion
 

 A.
 
 Summary of Appellants’ Contentions
 

 At the outset, it is helpful to outline the positions of the two appellants, the Registrar and RSC. The Registrar appeals the trial court’s determination that the Registrar should have counted as valid 360 signatures in various categories.
 
 [4]
 
 The Registrar also appeals the award of costs and attorney fees. The Registrar does not appeal the trial court’s order placing the referendum petition on the November 5, 1996, ballot, and does not seek to nullify the results of the election which rejected the Ordinance.
 
 [5]
 

 RSC, which owns property affected by the Ordinance, appeals the trial court’s determination that the Registrar should have counted as valid 217 signatures. (These 217 signatures are all included in the larger group of 360 signatures challenged by the Registrar.) RSC argues that these signatures should not have been counted as valid, and as a result, there were insufficient valid signatures to qualify the referendum for the ballot.
 

 RSC also contends that because the referendum was not entitled to be placed on the ballot, and because only a referendum with sufficient signatures could suspend the Ordinance, the election had no effect on the Ordinance, which went into effect in March 1996. Regarding attorney fees, RSC contends that (1) Keifer was not entitled to attorney fees because the underlying judgment was erroneous, and (2) even if the fee award was proper, the trial court erred in imposing liability for such fees on intervener RSC.
 

 B.
 
 Verification of Signatures
 

 We first examine whether the trial court erred in directing the Registrar to count certain signatures as valid. We begin with a brief description of the legal basis for this procedure.
 

 1.
 
 Statutory Framework
 

 California Constitution, article II, section 11, empowers the Legislature to establish procedures which govern county referenda. In accord with this
 
 *257
 
 constitutional authority, the Legislature has provided procedures in the Elections Code
 
 [6]
 
 by which referendum rights may be exercised at the county level. The Legislature has imposed certain duties upon elections officials, and has also determined that certain requirements must be satisfied by petition signers, circulators and proponents in order for petitions to qualify for the ballot. These requirements serve to safeguard the integrity of the electoral process, and to provide elections officials with orderly and clear procedures for determining whether a measure is qualified for the local ballot.
 

 Courts have regularly Upheld and given effect to legislation establishing procedures for the exercise of initiative and referendum rights and facilitating the performance of duties of elections officials. (See, e.g.,
 
 Assembly
 
 v.
 
 Deukmejian
 
 (1982) 30 Cal.3d 638, 647 [180 Cal.Rptr. 297, 639 P.2d 939] (hereafter Assembly) [residence address requirement];
 
 Hartman
 
 v.
 
 Kenyon
 
 (1991) 227 Cal.App.3d 413, 419-421 [277 Cal.Rptr. 765] [residence address requirement and circulation dates in circulator’s affidavit].)
 

 After a petition is submitted, elections officials have 30 business days to review the petition and determine whether it contains the necessary number of signatures of persons who were qualified registered voters at the time they signed the petition. (See §§ 9114,
 
 [7]
 
 100.) To accomplish this, elections officials are required to compare information on the petition with information on the voter’s affidavit of registration. (See §§ 105, 9114.) (1) Section 9114 provides that the “elections official shall examine the petition, and
 
 from the records of registration
 
 ascertain whether or not the petition is signed by the requisite number of voters. . . .” (Italics added.) This limitation prohibits elections officials from examining extrinsic evidence or going beyond the petitions and affidavits of registration.
 
 (Assembly, supra,
 
 30 Cal.3d at p. 647, fn. 8.)
 

 
 *258
 
 The parties agree that the referendum petition in this case, to be qualified for the ballot, was required to be signed by at least 9,197 voters of Monterey County. (See § 9144 [petition “shall be signed by voters of the county equal in number to at least 10 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election”].) As noted earlier, the Registrar determined that the petition did not contain the required number of signatures, and the trial court (ordering additional signatures to be counted as valid) determined that it did.
 

 On appeal, the Registrar and RSC challenge the trial court’s order with regard to numerous signatures. The signatures challenged by the Registrar fall within 6 general categories: (1) 144 signatures where affidavits of' circulators stated that the referendum petition had been circulated prior to the circulation period; (2) 111 signatures which were accompanied only by the signer’s mailing address or post office box and not by the signer’s residence address; (3) 54 signatures where the signer’s residence address on the referendum petition was different from the residence address on the signer’s affidavit of voter registration; (4) 34 signatures which were accompanied by incomplete residence addresses when compared to the signer’s affidavit of voter registration; (5) 8 signatures where the name and/or address on the referendum petition appeared to have been filled in by someone other than the signer; and (6) 9 signatures where part of the information on the referendum petition had been typed. RSC’s appeal also focuses on these categories of signatures, with the exception of category (1).
 
 [8]
 

 2.
 
 Challenged Signatures
 

 (a)
 
 Circulator Affidavits Showed Petition Circulated Prior to Circulation Period (144 Signatures)
 

 The registrar invalidated 270 signatures on the ground that the circulator’s affidavits showed that the petition had been circulated before the ordinance had been adopted. Of these 270 signatures, the trial court found that 144 should have been validated because the circulator’s affidavits contained clerical errors that were obvious on the face of the petition sections. On appeal, the Registrar argues that the trial court erred in directing him to count these 144 signatures as valid.
 

 The referendum petition here was required to be circulated during the 30 days following the passage of the Ordinance. Most county ordinances become effective 30 days after final passage by the board of supervisors.
 
 *259
 
 (§ 9141, subd. (b).) Section 9144 requires that a referendum petition be presented to the board of supervisors prior to the effective date of the ordinance. In construing former section 3751 (a predecessor to section 9141) the court in
 
 Kuhs
 
 v.
 
 Superior Court
 
 (1988) 201 Cal.App.3d 966 [247 Cal.Rptr. 544], referred to the period during which referendum petitions may be circulated as “a full 30 days” following passage of the legislative act being protested.
 
 (Id.
 
 at p. 974.) Here, the Ordinance was passed on February 6, 1996, and the 30-day qualifying period was from February 7 through March 7, 1996.
 

 Section 104 requires that each section of the petition have a declaration signed by the circulator, setting forth certain information in the circulator’s own hand, including “[t]he dates between which all the signatures on the petition or paper were obtained” and “[t]hat the circulator circulated that section and witnessed the appended signatures being written.” (§ 104, subds. (a)(3), (b)(1). ( The circulator must certify the content of the declaration'as to its truth and correctness under penalty of perjury. (§ 104, subd. (c).)
 

 For the 144 signatures at issue here, the circulator declarations attested that the signatures were obtained
 
 before
 
 the permissible period. For example, several of the circulator’s affidavits at issue stated that “[a]ll signatures on this document were obtained between the dates of 2/2 and 2/6 . . . [¶] Executed on 2/6, 1996 . . . .” Other affidavits involving the same circulator stated that “[a]ll signatures on this document were obtained between the dates of 2/5 and 2/5 .. . [¶] Executed on 2/5, 1996 . . . .”
 

 Although respondents submitted declarations of Mapstead (concerning the dates the referndum petition was available for signature) and the circulator (regarding corrected circulation dates), the Registrar was without authority to accept such supplemental declarations. (See
 
 Hartman
 
 v.
 
 Kenyon, supra,
 
 227 Cal.App.3d 413, 420 [elections official was without statutory authority to accept the recall proponent’s amendments to the circulator’s declaration to cure defects which had caused signatures to be invalidated].) The Registrar was also without authority to examine extrinsic evidence. (See
 
 Assembly, supra,
 
 30 Cal.3d at p. 647, fn. 8;
 
 Wheelright
 
 v.
 
 County of Marin
 
 (1970) 2 Cal.3d 448, 456 [85 Cal.Rptr. 809, 467 P.2d 537].)
 

 Respondents argue that “while it is true the Registrar may not examine extrinsic evidence, it is also true he may not disregard common sense.” They argue that common sense required the Registrar to correct these dates, because the dates listed by the circulator contained an “obvious clerical error.” The referendum petition states that it relates to the Ordinance adopted on “this 6 day of February 1996, upon motion of Supervisor Karas, seconded
 
 *260
 
 by Supervisor Perkins, by the following vote . . . .” and then sets forth each supervisor’s vote regarding the Ordinance. Based on this petition language, respondents argue that it is “self-evident the signatures could not have been obtained prior to the vote on February 6, 1996. Thus it is self-evident the circulator meant to put a ‘3’ instead of the ‘2’ on the declaration . . . .”
 

 Under the particular circumstances of this case, in which the petition contained the February 6, 1996, date of the passage of the Ordinance, the names of the supervisors who moved and seconded the Ordinance, and each supervisor’s vote for or against the Ordinance (all information that was not available until February 6, 1996), we are persuaded that the petition sections must have been circulated
 
 after
 
 February 6, 1996. Accordingly, the dates given by the circulator (e.g., 2/2) were obviously incorrect. Because the actual circulation dates could not be before February 6 (when the information on the face of the petition became available) or after March 7 (when the petition had been turned in) it is easy to determine that the correct dates were the corresponding dates in March 1996 (e.g., 3/2).
 

 The Registrar argues that the dates given by the circulator should not be changed, citing
 
 Hartman
 
 v.
 
 Kenyon, supra,
 
 227 Cal.App.3d 413. In
 
 Hartman,
 
 the elections official faced numerous problems reviewing a recall petition, including “circulators’ failure to include dates, failure to sign declarations, and inclusion of circulation dates prior to approval of the form of the petitions by the Clerk.”
 
 (Id.
 
 at p. 416.) Regarding the dates given in the circulators’ affidavits, we stated: “[W]here, as here, the declarations affirmatively demonstrate they were circulated outside the 120-day period set by the Legislature within which all signatures must be obtained, or where they fail to state they were circulated within the statutory period, then these ‘irregularities’ affect the validity of the petition itself. If the signatures were not obtained within the 120-day window period, they may not be counted.”
 
 (Id.
 
 at p. 419.)
 

 The referendum petition sections here are not similar to the recall petition declarations in
 
 Hartman,
 
 which affirmatively demonstrated that they were circulated outside the statutory period. In this case the petition sections themselves (through the language of the petition itself regarding events on February 6, 1996, and the fact that they were turned in by the required deadline in March 1996) demonstrated that the signatures at issue
 
 were
 
 collected within the required time period. Accordingly, the trial court did not err in finding that the petition sections here contained obvious clerical errors, and that the 144 signatures on these sections should have been counted by the Registrar.
 

 
 *261
 
 (b)
 
 Address on Petition Was a Mailing Address or Post Office Box (111 Signatures)
 

 Certain signatures were considered invalid by the Registrar because they were accompanied only by the signer’s mailing address or post office box, and not by the signer’s residence address or other description of the place of residence. The trial court found that 111 such signatures should have been considered valid. On appeal, the Registrar and RSC argue that the trial court’s order regarding these signatures was inconsistent with the Elections Code.
 

 Section 100, which establishes signer requirements, provides in part: “. . . only a person who is an eligible registered voter at the time of signing the petition or paper is entitled to sign it. Each signer shall at the time of signing the petition or paper personally affix his or her signature, printed name, and
 
 place of residence, giving street and number, and if no street or number exists, then a designation of the place of residence which will enable the location to be readily ascertained.”
 
 (Italics added.)
 

 Section 105 directs elections officials regarding how to determine whether the “residence address” requirement has been satisfied: “[T]he elections official shall determine that the residence address on the petition ... is the same as the residence address on the affidavit of registration. If the addresses are different,
 
 or if the petition or paper does not specify the residence address,
 
 ... the affected signature shall not be counted as valid. . . .” (Italics added.) This court has upheld section 105 (formerly section 45) as constitutional.
 
 (Hartman
 
 v.
 
 Kenyon, supra,
 
 227 Cal.App.3d at pp. 421-424.)
 

 In sections 100 and 105, the Legislature could not have been more clear: If the petition does not specify the residence address, the signature shall not be counted as valid. “Words used in a statute or constitutional provision should be given the meaning they bear in ordinary use. ... If the language is clear and unambiguous there is no need for construction . . . .”
 
 (Lungren
 
 v.
 
 Deukmejian
 
 (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], citations omitted.) We are persuaded that the plain meaning of sections 100 and 105 compelled the Registrar’s decision regarding the 111 signatures at issue here.
 

 The reasons behind the requirement that signers designate a place of residence, rather than a mailing address, are practical ones. A post office box, unlike a residence address, provides no indication as to the actual physical location of a person’s residence. A person may move to a new residence (and no longer be eligible to vote) but keep the same post office
 
 *262
 
 box. With only a post office box on the petition, the petition signer has made no statement regarding the physical location of his or her residence.
 
 [9]
 
 The petition thus does not show (and the Registrar has no way of knowing) whether the signer was a qualified registered voter
 
 at the time of signing.
 

 Our interpretation of the mandatory residence address requirement in sections 100 and 105 is supported by the relevant legislative history, by the Secretary of State’s guidelines for elections officials, and by applicable case law. The legislative history of section 105 (formerly section 45)
 
 [10]
 
 specifically addresses the question of mailing addresses or post office boxes. The Assembly Bill analysis dated May 22, 1981, states in part: “AB 2150 would also clarify the law in that only a residence address will be compared against the affidavit of registration. This would mean that
 
 signers of a petition
 
 or paper
 
 may not use
 
 any other address, such as
 
 a mailing address or post office box
 
 number.” (Italics added.) The bill analysis as amended on May 28, 1981, includes the same statement. Bill analyses have been recognized and used by the courts to ascertain legislative intent. (See, e.g.,
 
 City of San Jose
 
 v.
 
 Superior Court
 
 (1993) 5 Cal.4th 47, 56 [19 Cal.Rptr.2d 73, 850 P.2d 621];
 
 City of Santa Cruz
 
 v.
 
 Municipal Court
 
 (1989) 49 Cal.3d 74, 92 [260 Cal.Rptr. 520,
 
 776
 
 P.2d 222].)
 

 The Supreme Court’s decision
 
 in Assembly, supra,
 
 30 Cal.3d 638 confirms that petition signers must provide their residence addresses on the petition. In
 
 Assembly,
 
 petitions to support a referendum challenging the 1981 congressional, Senate and Assembly reapportionment statutes asked signers to give “ ‘Your Address as Registered to Vote’ ”
 
 (id.
 
 at p. 646) rather than requesting a current residence address. This thwarted efforts to verify that each voter met the statutory requirement of being a qualified registered voter at the time of signing.
 

 While acknowledging that this mistake went to the very heart of the voter qualification requirement, the Supreme Court permitted the referendum to take place. The court based its decision upon evidence that the same mistake had taken place in numerous important statewide initiative measures presented to the voters from 1978 through 1980, had been accepted by the
 
 *263
 
 government entities charged with enforcing the referendum procedures, and had never been challenged.
 
 (Assembly, supra,
 
 30 Cal.3d at p. 651.) The court concluded that “[u]nder the unusual and unique circumstances” of that case, failure to comply with the statutory requirements would not render the referendum petitions invalid.
 
 (Id.
 
 at p. 652.)
 

 Although the referendum in
 
 Assembly
 
 was allowed to take place, the Supreme Court stressed the importance of the residence address requirement: “[W]ithout the petition signer’s current residence address on the petition, it is
 
 impossible
 
 for the clerk to determine whether the signer was a ‘qualified registered voter.’ ” (30 Cal.3d at p. 647, original italics.) The court also stated that the defect in the petitions was not a mere technical shortcoming, but actually prevented elections officials from ensuring that petitions had been signed by those entitled to do so, the “very heart”
 
 (id.
 
 at p. 648) of the statute’s purpose. The court concluded that future petitions must comply with the statute (“ ‘petition sections shall be designed so that each signer shall personally affix his or her . . . [r]esidence address . . .’”
 
 (ibid.))
 
 and that failure to do so would render them “invalid per se.”
 
 (Id.
 
 at p. 652.)
 

 The Secretary of State’s “Guidelines for Verifying Election Petitions” also support the Registrar’s decision. Those guidelines, submitted at trial in this case, state that where “[s]igner includes post office address without a residence address,” the signature should not be verified. This court has previously cited the guidelines with approval in
 
 Hartman
 
 v.
 
 Kenyon, supra,
 
 227 Cal.App.3d at page 419. In this case, the record also includes a declaration by an attorney with the Elections Division of the Secretary of State, affirming the Secretary of State’s position that signatures accompanied on the referendum petition only by a post office box or mailing address should not be counted. The Secretary of State also confirmed this position in an amicus curiae brief filed in this appeal.
 

 We are persuaded that sections 100 and 105, as consistently interpreted by relevant legislative history, case law, and the Secretary of State, compelled the Registrar’s decision not to verify the 111 signatures that were accompanied only by the signer’s mailing address or post office box, and not by the signer’s residence address or other description of the place of residence.
 

 Respondents’ arguments to the contrary are unconvincing. First, respondents argue that by signing the petitions with their post office box or mailing addresses, the signers have “affirmed that they are still at their addresses as set out on the voter registration affidavit. There has thus been substantial compliance by all 111 signers.” This is factually incorrect. Even assuming that these signers affirmed their post office boxes or
 
 mailing
 
 addresses, they
 
 *264
 
 did nothing
 
 on the petition
 
 to indicate where they
 
 actually lived at the time of signing.
 
 Contrary to respondents’ contention, they did not indicate whether or not they still lived at the addresses listed on their voter registration affidavits. As a result, they have not “substantially complied” with the residence address requirement. As the Supreme Court noted in
 
 Assembly, supra,
 
 30 Cal.3d at page 649, “ ‘[s]ubstantial compliance . . . means
 
 actual
 
 compliance in respect to the substance essential to every reasonable objective of the statute.’ ” (Original italics.) A mailing address or post office box simply does not fulfill the statutory purpose of the residence address requirement (to allow the election officials to determine whether the signer was a qualified registered voter at the time of signing).
 

 Respondents state that of the 111 signers who gave post office boxes and mailing addresses on the petition, 24 gave the
 
 same
 
 mailing address on their voter registration affidavits in the box designated for “residence address.” The trial court found, however, that in addition to the mailing address, each of these 24 signers “had also put a residence address or physical location of their residence on the voter registration affidavit.” The remaining 87 signers gave their residence address on the voter registration affidavit in the space provided for it, but only put a mailing address on the petition. In summary, all 111 signers had residence addresses somewhere on their voter registration affidavits, but not on the referendum petition. Whatever the exact arrangement of the information on their voter registration affidavits, the affidavits contained residence addresses, whereas the petition did not. We are not persuaded that any of these 111 signers fulfilled the statutory requirement of a residence address on the referendum petition.
 

 Finally, there is no unfairness in requiring compliance with the longstanding statutory requirements in this case. The petitions in this case instructed signers to write their “Residence Address Only.” The record includes instructions to petition circulators which stated, “Post office boxes are not valid addresses. Signers must use their physical address for residence.”
 

 The action of the Registrar invalidating these signatures for which the petition contained only a mailing address or post office box was correct, and the trial court’s order to the contrary is erroneous as a matter of law.
 

 " (c)
 
 Residence on Petition Differed From Registered Address (54 Signatures)
 

 The trial court ordered the Registrar to count as valid 54 signatures even though the signer’s residence address on the referendum petition
 
 *265
 
 differed from the residence address on the signer’s affidavit of voter registration. In these 54 cases, the signer’s address on the petition was within the
 
 same voting precinct
 
 as the signer’s address shown on the affidavit of voter registration.
 

 Section 105 specifies: “For purposes of verifying signatures on any . . . referendum . . . petition . . . , the elections official shall determine that the residence address on the petition or paper is the same as the residence address on the affidavit of registration.
 
 If the addresses are different,
 
 or if the petition . . . does not specify the residence address,
 
 ... the affected signature shall not be counted as valid. . .
 
 .” (Italics added.)
 

 Once again, we find this statutory language to be clear and controlling. Section 105 compelled the Registrar’s decision not to count these 54 signatures as valid.
 

 The Registrar’s decision not to count these 54 signatures as valid is also consistent with the legislative history of section 105.
 
 [11]
 
 In addition, the Registrar’s decision was consistent with
 
 Hartman
 
 v.
 
 Kenyon, supra,
 
 227 Cal.App.3d 413, in which this court upheld an elections official’s refusal to count as valid signatures where the signer’s residence address on the petition did not match the residence address on his or her voter registration affidavit: “The Clerk did not err in following the mandate of section 45 [now section 105] and disqualifying the signatures of signers who listed a different residence address on the petition from the address they listed on their voter registration affidavit.”
 
 (Id.
 
 at p. 423.)
 

 Respondents concede that the addresses for the 54 signers were different, but argue that the “question is [whether] the 54 signers [were] ‘eligible registered voters at the time of signing the petition.’ ” This, however, is not the only issue. The 54 signers here, even assuming they were registered voters, were still required to comply with the signer requirements of section 100, and were subject to the verification requirements of section 105.
 

 Respondents emphasize that the 54 signers’ voter registration affidavits were not automatically canceled by moving to new addresses in the same
 
 *266
 
 precincts. (See § 2204.)
 
 [12]
 
 As a result, according to respondents, these voters who moved within the precinct can vote, are “eligible registered voters,” and should be allowed to sign referendum petitions using the new address. This argument (that the Registrar should allow non-matching addresses within the same precinct) conflicts with the clear language of section 105, which requires the addresses (not simply the precincts) to match.
 

 Respondents also argue that for voters who moved within the precinct, section 100 (allowing eligible registered voters to sign a petition) conflicts with section 105 (requiring an address match). According to respondents, this conflict may be resolved if section 105 is “read broadly to mean that a match occurs when the address on the petition is in the same precinct as the voter’s residence address on his registration affidavit.”
 

 The language of section 105 is not subject to this reformation. Sections 100 and 105 contain separate requirements, but they do not conflict. No eligible registered voter is disenfranchised (or prevented from signing a petition) by their combined requirements. A registered voter who remains at the same address listed on his or her voter registration affidavit may sign a referendum petition without reregistering. A registered voter who moves within the same voting precinct (or between voting precincts) must reregister in order to sign a referendum petition. As authorized by section 2102, subdivision (b), the voter may immediately execute and submit to the Registrar a new voter registration affidavit showing the voter’s new residence.
 
 [13]
 
 In either case, the eligible registered voter may sign the petition. Other persons, who are not eligible registered voters, may not.
 

 In light of section 105’s clear requirement that the signer’s residence address shown on the petition be the same as the residence address shown on the signer’s voter registration affidavit, the Registrar had no duty to count the 54 signatures as valid. The trial court exceeded its authority in compelling him to do so.
 

 (d)
 
 Incomplete Addresses (34 Signatures)
 

 The Registrar originally invalidated 56 signatures because the address of the signer as shown on the referendum petition was incomplete
 
 *267
 
 when compared to the signer’s affidavit of voter registration. The Registrar subsequently found one of these signatures to be valid. The trial court found that 34 additional signatures had “substantially complied” with the requirements of the Elections Code and should have been validated. Of these 34 signatures, 10 showed a street name and city, but no house number; 11 showed a house number and street name, but no city; and 13 showed only a city, but no house number or street.
 

 The Registrar’s decision not to count these 34 signatures as valid was consistent with the applicable provisions of the Elections Code. Sections 100 and 9020 require signers to personally affix their “place of residence, giving street and number” and, if no street or number exists, then a designation of place of residence that will enable the location to be readily ascertained. As noted earlier, section 105 requires that if the residence address on the petition does not match the residence address on the affidavit of registration, the affected signature shall not be counted. The incomplete addresses at issue here both failed to enable the residence locations to be ascertained, and failed to match the addresses on the voter registration affidavit.
 

 The statutory purposes behind the residence address requirement also support the Registrar’s decision. As the court noted in
 
 Assembly, supra,
 
 30 Cal.3d 638, obtaining the signer’s residence address at the time of signing is critical to the elections official’s duty to “ensure that petitions have been signed by those entitled to do so . . . .”
 
 (Id.
 
 at p. 648.) Even if the
 
 portions
 
 of the address given on the petition matched the address on the voter registration affidavit, the Registrar could not verify the residence address of the signer.
 

 Moreover, the Registrar may not investigate or find additional information to supplement incomplete addresses listed on the petition. Section 9114 requires that elections officials “examine the petition, and
 
 from the records of registration
 
 ascertain whether or not the petition is signed by the requisite number of voters.” The Registrar is thus prohibited from examining any extrinsic evidence.
 
 (Assembly, supra,
 
 30 Cal.3d at 647, fn. 8;
 
 Wheelright
 
 v.
 
 County of Marin, supra,
 
 2 Cal.3d at p. 456 [registrar “is limited in his comparison of the signatures and may not go outside the registration affidavit to determine this”].)
 

 Finally, the Registrar has only 30 working days within which to use a random sampling technique to verify petition signatures (§ 9115) and to conduct a complete examination and verification of each signature filed if the random sampling technique does not produce a clear result. (§ 9114.) These time constraints are not consistent with an administrative burden to investigate or speculate about addresses that signers have left incomplete.
 

 
 *268
 
 Respondents suggest that “the failure to put a different address down on the petition is dispositive proof [that the signers] have not moved.” This is incorrect. The problem is that from the address given, the Registrar
 
 cannot determine
 
 whether or not the signer has moved from the address given on the voter registration affidavit. We agree with the Registrar that the relevant statutes do not permit him to assume or guess that the signer’s residence has remained the same.
 

 Here, for the 13 petition signers who gave only their city of residence, without street name or house number, it would be pure speculation to assume that these signers continued to reside at the addresses listed on their voter registration affidavits. The same is true for the 10 signers who gave a city and street name but no house number. A street may run throughout the city, and persons may certainly move to addresses elsewhere on the same street.
 

 For the 11 signers who gave their house number and street name but did not identify the city, the question is somewhat closer, but the result is the same. Section 105 requires the residence address on the petition to match the residence address on the affidavit of registration for the signature to be counted. Where the petition failed to include a city, the addresses did not match. As a practical matter, although some street addresses may be specific to certain cities or locations, others (such as Main or First Street) are not. In addition, as noted earlier, the Registrar had only 30 business days to verify the signatures and was precluded from considering extrinsic evidence. In light of the statutory requirement, the practical possibilities and the administrative burden on the Registrar, we hold that the responsibility for providing a complete residence address (including city) rests with the signers, not with the Registrar.
 

 In summary, consistent with the statutes, the statutory purposes for the residence address requirement and the time constraints upon elections officials, the Registrar simply should not investigate or speculate about the location of a residence. The Registrar’s action invalidating these 34 signatures was consistent with statutory requirements and was not arbitrary, capricious, or an abuse of discretion. Accordingly, the trial court erred in requiring these 34 signatures to be counted as valid.
 

 (e)
 
 Signer’s Name and/or Address on the Petition Appeared to Have Been Filled in by Someone Else (Eight Signatures)
 

 The Registrar invalidated a number of signatures because it appeared that the signer’s name and/or address on the referendum petition had been filled in by someone other than the signer. After examining the
 
 *269
 
 signatures on the petition and the related voter registration affidavits, the trial court found that eight of these “substantially complied” with the requirements of the Elections Code because the signatures matched, and ordered the additional eight signatures validated.
 
 [14]
 

 The signer’s requirement at issue is set forth in section 100, which provides in part:
 
 “Each signer shall
 
 at the time of signing the petition or paper
 
 personally affix
 
 his or her signature,
 
 printed name, and place of residence, giving street and number
 
 . . . .” (Italics added.) Consistent with this requirement, section 9020 provides: “The petition sections shall be designed so that each signer shall
 
 personally affix
 
 all of the following: [¶](a) His or her signature. [¶](b)
 
 His or her printed name.
 
 [¶](c)
 
 His or her residence address . . .
 
 . [¶](d) The name of his or her incorporated city or unincorporated community.” (Italics added.)
 

 First, we note that whether the signer “personally affixed” his or her printed name and residence address is essentially a factual question. Thus, the question before the trial court was whether the Registrar acted reasonably. (See
 
 Wheelright
 
 v.
 
 County of Marin, supra,
 
 2 Cal.3d at p. 456.)
 
 [15]
 

 Here, the Registrar concluded that the information had not been filled in by the petition signer. Consistent with the statutory requirements set forth above that the signers “personally affix” the information and the Secretary of State’s guidelines,
 
 [16]
 
 the Registrar did not count the signatures as valid.
 

 At trial, the evidence concerning who affixed the names and addresses in question included the Registrar’s declaration describing the examination of
 
 *270
 
 these signatures, and his conclusion that the printed names and addresses “appeared to have been filled in by someone else other than the signer . . . .” The petition sections themselves were also available, and were examined by the trial court. In one case, the petition itself indicated that the circulator (rather than the signer) had written the address. There was no contrary evidence that the signers had personally affixed the printed names and addresses. On appeal, respondents state that “[m]any of the addresses and printed names were provided by the spouse of the signer.”
 

 The trial court, after determining that the
 
 signatures
 
 appeared to match, held that the signers had “substantially complied” with the requirements of the Elections Code because the signatures matched.
 
 [17]
 
 Rather than rejecting the Registrar’s factual finding (that the printed names and addresses had been filled in by someone other than the signer), it appears that the trial court believed that the requirement was unimportant as long as the signatures matched.
 

 Under the standard of review set forth in
 
 Wheelright
 
 v.
 
 County of Marin, supra,
 
 2 Cal.3d 448, however, the question for the trial court was whether the Registrar acted reasonably. Under the circumstances here, with
 
 no
 
 evidence that the signers in question
 
 did
 
 “personally affix” their printed names and/or addresses as required by the statute, the trial court erred in rejecting the Registrar’s factual determination.
 

 Considering the requirement that signers “personally affix” printed names and addresses, respondents suggest that “how this requirement furthers a legitimate concern cannot be specified.” The requirement, however, is neither redundant nor insignificant. Both the additional attention of the signer (who must “personally affix” the information) and the result (the additional ability to verify that the signer was actually involved in the process) aid in preventing forgery and other potential abuse. (Cf.
 
 Browne
 
 v.
 
 Russell
 
 (1994) 27 Cal.App.4th ,1116, 1125 [33 Cal.Rptr.2d 29];
 
 Dodge
 
 v.
 
 Free
 
 (1973) 32 Cal.App.3d 436, 444 [108 Cal.Rptr. 311].) In addition, the requirement that the signer “personally affix” the information ensures that the signer, at the. time of signing, has actually affirmed the residence address placed on the petition. This affirmation goes to the very heart of the process—the Registrar’s ability to verify whether those who signed the petition were entitled to do so. (See
 
 Assembly, supra,
 
 30 Cal.3d at p. 648.)
 

 In view of the statutory requirement that the signer “personally affix” the required information, the statutory purpose, and the lack of
 
 *271
 
 evidence that the signers here did personally affix the required information, the Registrar did not act arbitrarily or unreasonably. His determination regarding these eight signatures should have been sustained.
 

 (f)
 
 Part of the Information on the Referendum Petition Was Typed (Nine Signatures)
 

 The Registrar originally invalidated nine signatures because part of the information on the referendum petition (such as the residence address) had been typed, and the Registrar was unable to determine whether the information had been “personally affixed” by the signer. The trial court ordered these signatures validated.
 

 As discussed above, sections 100 and 9020 both require the signer’s “printed name” and residence address to be “personally affixed” by the signer. The Secretary of State’s guidelines provide that the signature should not be verified if the address of the signer is “typed or written in by someone other than the signer.”
 

 As the trial court acknowledged, there was no evidence identifying the person who typed the information. During the hearing, the trial court stated that if there are two equally reasonable interpretations, the decision must be in favor of the “support of the referendum.” The court’s statement of decision provides that “someone typed the information upon the petition and there is no reason to assume it was not the party who signed the petition.” Accordingly, the court ordered the nine signatures counted as valid.
 

 We have examined the typed information invalidated by the Registrar. For many of these nine cases, the signer was also the circulator, and had also signed the circulator’s declaration. We question, as did the trial court, the Registrar’s conclusion that these persons did not “personally affix” their own printed name and residence address.
 

 Under the standards discussed above in
 
 Wheelright
 
 v.
 
 County of Marin, supra,
 
 2 Cal.3d at page 456, however, the court should defer to the factual determination of the elections official where he or she has acted reasonably and not acted arbitrarily or fraudulently. Although we are not sure that the Registrar’s conclusion is correct (or that we would have made the same factual findings as the Registrar regarding these documents), the evidence does not support a determination that the Registrar acted unreasonably, arbitrarily or fraudulently in disallowing these signatures. Accordingly, the Registrar’s factual determinations should have been sustained, and the trial court erred in ordering these nine signatures to be counted as valid.
 

 
 *272
 
 (g)
 
 Summary
 

 The trial court found that the referendum petition contained 9,309 signatures, and was sufficient to be placed on the ballot (which required 9,197 signatures) by a margin of 112 signatures. Of those 9,309 signatures found valid by the trial court, the Registrar and RSC have contested 360 signatures in this appeal. As set forth above, we conclude that the trial court erred in directing the Registrar to count 216 of the contested 360 signatures. The trial court’s finding of 9,309 signatures was thus incorrect by 216 signatures, and the correct number of valid signatures was 9,093. This number is insufficient for placement on the ballot by 104 signatures. The Registrar thus correctly certified that the petition contained insufficient signatures for placement on the ballot.
 

 C.
 
 Effect of the Election
 

 1.
 
 Contentions of the Parties
 

 As noted earlier, the election took place on November 5, 1996, and the Ordinance challenged by the referendum was rejected by the voters.
 

 The parties differ regarding the effect of the election. RSC contends that the referendum should not have been on the ballot, and that the results of the referendum election should therefore have no effect on the Ordinance, which took effect by statute on March 8, 1996. The Registrar, despite his contention that the petition contained insufficient signatures to qualify for the ballot, does
 
 not
 
 appeal the trial court’s order placing the referendum on the ballot, and does not seek to nullify the results of the election which rejected the Ordinance. The Registrar argues that “[ojnce the election has been held and the electorate has spoken, the election result should not be overturned.” Respondents contend that the appeal is moot (except as to issues regarding attorney fees) because the referendum election has already been held, and that RSC should not be permitted to “destroy an otherwise valid election after it lost the referendum at the ballot box.”
 

 2.
 
 Statutory Provisions
 

 We begin our analysis with the statutes governing ordinances challenged by referendum petitions. First, section 9114 provides that “[i]f the petition is found insufficient, no further action shall be taken.” (See also §§ 9115, 9146.) Had the trial court properly applied the law, the Registrar’s certification of insufficiency would have been upheld, and the referendum would not have been placed on the ballot. The Ordinance would have become effective,
 
 *273
 
 like most county ordinances, “30 days from and after the date of final passage.” (§ 9141, subd. (b).)
 

 A referendum petition may, however, suspend an ordinance. Section 9144 provides: “If a petition protesting the adoption of an ordinance is presented to the board of supervisors prior to the effective date of the ordinance, the ordinance
 
 shall be suspended
 
 and the supervisors shall reconsider the ordinance. The petition
 
 shall be signed
 
 by voters of the county equal in number to at least 10 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election.” (Italics added.)
 

 Section 9145 provides: “If the board of supervisors does not entirely repeal the ordinance against which a petition is filed, the board shall submit the ordinance to the voters either at the next regularly scheduled county election occurring not less than 88 days after the date of the order, or at a special election called for that purpose not less than 88 days after the date of the order. The ordinance shall not become effective unless and until a majority of the voters voting on the ordinance vote in favor of it.”
 

 The question presented here is how these statutes should be applied where a referendum petition contained
 
 insufficient
 
 signatures, but was nevertheless submitted to the voters, and the resulting election defeated the ordinance protested by the referendum. The parties have not discussed any case involving this precise situation.
 

 3.
 
 Mootness
 

 The Registrar and respondents argue that once the election has been held, the issue is moot, relying primarily on the case of
 
 Chase
 
 v.
 
 Brooks
 
 (1986) 187 Cal.App.3d 657 [232 Cal.Rptr. 65], In
 
 Chase,
 
 a city council enacted a zoning ordinance reclassifying property described in an attached exhibit. A referendum petition protesting the ordinance was circulated, but the petition did not include the exhibit describing the property affected by the ordinance as required by former section 4052. The city clerk accepted the petition. Chase filed suit to enjoin the city from placing the referendum on the ballot. (187 Cal.App.3d at p. 660.)
 

 The trial court concluded that the referendum petition substantially complied with the statutory requirements, and therefore granted summary judgment for the city and denied Chase’s motions requesting injunctive relief.
 
 (Chase
 
 v.
 
 Brooks, supra,
 
 187 Cal.App.3d at pp. 660-661.) The measure was placed on the ballot, an election was held, and the referendum measure to which Chase objected “carried overwhelmingly.”
 
 (Id.
 
 at p. 659.)
 

 
 *274
 
 The appellate court determined that the petitions were fatally defective because they failed to include the complete text of the ordinance on which the referendum was sought.
 
 (Chase
 
 v.
 
 Brooks, supra,
 
 187 Cal.App.3d at p. 664.) Nevertheless, the court held that the controversy had become moot by virtue of the election, and denied Chase’s request that the election be treated as a nullity.
 
 (Id.
 
 at p. 660.)
 

 The
 
 Chase
 
 court found two analogous cases,
 
 Lenahan
 
 v.
 
 City of Los Angeles
 
 (1939) 14 Cal.2d 128 [92 P.2d 1014], and
 
 Long
 
 v.
 
 Hultberg
 
 (1972) 27 Cal.App.3d 606 [103 Cal.Rptr. 19], both of which held challenges to recall petitions moot after the elections had taken place. The court found these cases, which are discussed in more detail below, persuasive. The
 
 Chase
 
 court stated that “ ‘. . . [t]he nature of the action was such that when the injunctive relief sought was rendered inappropriate and ineffective, any further consideration of the cause as an action in injunction would be unavailing.’ ” (187 Cal.App.3d at p. 662.) The court also noted that although the referendum petition in
 
 Chase
 
 had not provided full information to prospective signers of the petition, “[t]he ballot measure and accompanying material adequately informed the electorate of the breadth and complete contents of the challenged ordinance . . . .”
 
 (Ibid.)
 

 In
 
 Lenahan
 
 v.
 
 City of Los Angeles, supra,
 
 14 Cal.2d 128, relied upon by the court in
 
 Chase,
 
 recall petitions were circulated, and certified by the city clerk as sufficient. A recall election was conducted at which the mayor was recalled and his successor was elected. Before the election, an action was filed to enjoin the city from conducting the recall election. The moving party alleged that the petitions were insufficient because of various problems (e.g., sections with insufficient information, signatures obtained by persons other than the ones making affidavits, false statements made by those obtaining signatures, forged signatures, paid circulators, and arbitrary rulings on questioned signatures). (14 Cal.2d at p. 131.) Upon motion of the city, the complaint was stricken, and service of summons was quashed.
 
 (Id.
 
 at pp. 131-132.)
 

 On appeal, the Supreme Court held that the injunctive action was moot after the election: “It appears beyond question that every act sought to be enjoined has actually taken place. The election has been held and it is not even intimated that any of the alleged deficiencies or irregularities in the presentation and certification of the recall petition prevented a full and fair vote at the recall election. The result of the election was duly canvassed and declared. The elected mayor assumed his office and has since been functioning as such. A reversal of the order would vest the trial court with no justiciable controversy in this action for the reason that what was sought to
 
 *275
 
 be enjoined has already been done. The nature of the action was such that when the injunctive relief therein sought was rendered inappropriate and ineffective, any further consideration of the cause as an action in injunction would be unavailing. In other words, when the event which it was sought to enjoin, that is, the election, had taken place, the remedies of the plaintiffs were removed from the field of injunctive relief and were relegated to such remedies, if any, as they might have and avail themselves of subsequent to the election. Certainly they may not, after the election has been held, still urge a court to stop it."
 
 (Lenahan
 
 v.
 
 City of Los Angeles, supra,
 
 14 Cal.2d at p. 132.)
 

 The Supreme Court in
 
 Lenahan
 
 also noted that its conclusions were supported by the provisions of the Los Angeles City charter. The charter provided: “ ‘After an election based on any initiative petition, the sufficiency of such petition in any respect shall not be subject to judicial review or be otherwise questioned.’ ” (14 Cal.2d at p. 133.) The court held that the law generally supported application of the same rule to a recall election.
 
 (Id.
 
 at p. 133.) Noting that the trial court had not considered the merits of the plaintiffs’ claims that the recall petitions were defective, the Supreme Court declined to consider those issues.
 
 (Id.
 
 at p. 134.)
 

 In
 
 Long
 
 v.
 
 Hultberg, supra,
 
 27 Cal.App.3d at pages 608-609, recall petitions regarding three city council members were circulated and found sufficient by the city clerk. The council members sought injunctive relief or writ of mandate barring further proceedings on the recall petitions, and the trial court denied this relief. A recall election was then held at which two of the council members were recalled and their successors were elected.
 
 (Id.
 
 at p. 608.)
 

 On appeal, the court emphasized that there had been no challenge to the fairness of the election itself in affording to the electorate a full and free opportunity to express its will, and dismissed plaintiffs’ appeal as moot.
 
 (Long
 
 v.
 
 Hultberg, supra,
 
 27 Cal.App.3d at pp. 608-609.) The court stated that the “purpose” of plaintiffs’ action “was but to forestall the election.”
 
 (Id.
 
 at p. 609.) The court in
 
 Long
 
 did not identify the petition deficiencies that were the subject of plaintiffs’ challenge.
 

 After careful consideration of
 
 Chase
 
 v.
 
 Brooks, supra,
 
 187 Cal.App.3d 657, and the authorities upon which the
 
 Chase
 
 court relied, we are persuaded that the issue raised in this case is also moot.
 
 Chase
 
 resembles this case in many respects. The trial court found the referendum petition sufficient, the referendum election was held, the referendum measure passed in the election (defeating the ordinance in question), and the appellate court held the
 
 *276
 
 referendum petition to be fatally defective. As in this case, had the trial court properly applied the law, the measure would not have appeared on the ballot.
 
 [18]
 

 The issue presented in this case (regarding insufficient
 
 signatures
 
 for placement of the measure on the ballot) is somewhat different from the issues presented in
 
 Chase
 
 and its predecessors. The defect in
 
 Chase,
 
 concerning the information received by petition signers, was “cured” to some extent by the ballot measure and accompanying material which contained full and adequate information about the ordinance. The defect here, in contrast, was not cured by ballot information. This case is also unlike
 
 Lenahan
 
 in that it does not involve any provision explicitly precluding judicial review of the sufficiency of the petition.
 

 Despite these underlying differences, however, this case was brought to obtain a writ of mandate directing the Registrar to verify certain signatures, and to certify that a sufficient "number of voters had signed the petition. These issues, the primary questions in this case, simply did not survive after the election was held on November 5, 1996. Accordingly, we are not persuaded by RSC’s argument that notwithstanding nearly two years of litigation, the trial court’s decisions, and the November 1996 court-ordered election, the Ordinance became effective in March 1996 “by operation of law.”
 

 In support of its contention, RSC cites numerous cases which arose in procedural circumstances different from those in this case. In
 
 Board of Supervisors
 
 v.
 
 Superior Court
 
 (1983) 147 Cal.App.3d 206 [195 Cal.Rptr. 67], the question was whether the appellate court would affirm the trial court’s issuance of a writ to reopen the time period for gathering petition signatures. The case did not involve an election, like the one here, that had already occurred. In
 
 Marblehead
 
 v.
 
 City of San Clemente
 
 (1991) 226 Cal.App.3d 1504 [277 Cal.Rptr. 550], the court invalidated an initiative election because the measure was “not within the electorate’s initiative power.”
 
 (Id.
 
 at p. 1510.) The court thus ruled upon the construction and validity of the initiative measure itself, and not the process by which it got on the ballot. In
 
 Daniels
 
 v.
 
 Tergeson
 
 (1989) 211 Cal.App.3d 1204 [259 Cal.Rptr. 879], Tergeson was elected as a county supervisor. The election was contested on the ground that Tergeson was not eligible for the office because he did not meet the 30-day advance registration requirement. The trial court refused to
 
 *277
 
 invalidate the election, but the appellate court reversed the judgment and nullified the election.
 
 (Id.
 
 at p. 1213.) The
 
 Daniels
 
 case, however, involved an election contest pursuant to a statute specifically authorizing voters to contest a previously held election. In contrast,
 
 Chase, Lenahan, Long
 
 and this case do not involve election contests.
 

 RSC also relies upon
 
 People’s Advocate, Inc.
 
 v.
 
 Superior Court
 
 (1986) 181 Cal.App.3d 316 [226 Cal.Rptr. 640]. In that case, the trial court had held a statewide initiative measure invalid. The appellate court held that portions of the initiative were unconstitutional, severed those portions from the rest of the initiative, and directed the trial court to set aside portions of its judgment.
 
 (Id.
 
 at p. 334.) The initiative election was not set aside because of procedural errors in getting the measure placed on the ballot or because parts of the measure were declared unconstitutional. In
 
 Whitmore
 
 v.
 
 Carr
 
 (1934) 2 Cal.App.2d 590 [38 P.2d 802], although an ordinance had been approved by voters at a referendum election, the ordinance had never been enacted by the city council. The court held that in the absence of prior enactment of the statute by the city council, there could be neither rejection nor adoption by the voters. “It never became an enactment by the council or the people, and as an ordinance of the City of Oakland it stands invalid and ineffectual for any purpose.”
 
 (Id.
 
 at p. 594.)
 
 Whitmore
 
 thus turned on whether the ordinance had ever been enacted in the first place, not whether it was properly placed on the ballot.
 

 The authorities cited by RSC do not persuade us that the election in this case must be set aside. Although these cases establish that after an election courts will still interpret measures adopted by the electorate and consider appropriate issues raised in an election contest, RSC has cited no case in which the court has invalidated a previously held election (in the absence of an election contest) on the basis of the process by which a measure was placed on the ballot.
 

 After considering the particular facts of this case and the arguments and authorities presented by the parties, we conclude that the election held approximately 17 months ago has rendered moot the issues presented to the trial court in this case. Because we hold that the appeal should be dismissed as moot, the election results stand and the Ordinance is without effect.
 
 [19]
 
 Our holding is limited to the facts of this case. Nothing in this opinion should be construed to hold that a referendum election will always moot underlying issues involving the sufficiency of the referendum petition.
 

 
 *278
 
 D.
 
 Attorney Fees
 

 On October 30, 1996, counsel for Keifer moved for an award of attorney fees (including paralegal fees) pursuant to section 1021.5 of the Code of Civil Procedure. That section provides that upon motion, a court “may award attorneys’ fees to a
 
 successful party
 
 against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons . . . .” (Italics added.)
 

 After trial and judgment, the court awarded fees to Keifer, and on December 18, 1996, entered an “Amended Revised Order Amending Judgment To Specify Costs and Attorneys Fees.” This order awarded attorney fees of $80,937.50 to counsel for Keifer by and through Keifer, paralegal fees of $7,948 to Keifer, and costs of $2,518.88 to Keifer. It also states that “[the Registrar] in his official capacity and [RSC] are jointly and severally liable for the award of costs and attorneys fees.”
 

 The award was made on the basis that the referendum proponents had prevailed at trial in challenging the Registrar’s certification of insufficiency. Because we hold that the Registrar’s certification of insufficiency should have been upheld by the trial court, the award of attorney fees and costs to counsel for Keifer is inappropriate. (See
 
 Save our Residential Environment
 
 v.
 
 City of West Hollywood
 
 (1992) 9 Cal.App.4th 1745, 1750-1751 [12 Cal.Rptr.2d 308];
 
 Bowman
 
 v.
 
 City of Petaluma
 
 (1986) 185 Cal.App.3d 1065, 1085 [230 Cal.Rptr. 413].)
 

 Respondents contend that even if this court determines that the referendum petition did not contain sufficient signatures for placement on the ballot, they are still the successful parties because their litigation resulted in the election, the Ordinance was defeated, and they obtained the results they sought. We reject this argument. The fact that a court-ordered election occurred before these issues could be adjudicated on appeal does not alter this court’s authority to reverse a fee award which was improvidently granted.
 

 Because the Registrar’s initial certification was correct, no respondent should have been a “successful party” at trial eligible for attorney fees. Respondents cite numerous cases, including
 
 Folsom
 
 v.
 
 Butte County Assn, of Governments
 
 (1982) 32 Cal.3d 668, 685 [186 Cal.Rptr. 589, 652 P.2d 437],
 
 In re Head
 
 (1986) 42 Cal.3d 223 [228 Cal.Rptr. 184, 721 P.2d 65], and
 
 Westside Community for Independent Living, Inc.
 
 v.
 
 Obledo
 
 (1983) 33 Cal.3d
 
 *279
 
 348, 352 [188 Cal.Rptr. 873, 657 P.2d 365]. Although these cases establish that fees may be awarded to a successful party who obtains results other than through final judgment (such as by obtaining interim relief, reaching a settlement, or inducing a “voluntary” change in defendant’s conduct), they do not support the proposition that a party who should have lost on the merits at trial becomes the “successful party” when the issues become moot on appeal.
 

 In light of our reversal of the trial court’s award of attorney fees, we need not address the parties’ arguments regarding whether the award should have been made against the Registrar and RSC jointly and severally.
 

 III. Disposition
 

 The appeal from the judgment on the merits is dismissed as moot. The trial court’s “Amended Revised Order Amending Judgment To Specify Costs and Attorneys Fees,” filed December 18, 1996, is reversed. Each party shall bear its own costs on appeal.
 

 Bamattre-Manoukian, J., and Mihara, J., concurred.
 

 A petition for a rehearing was denied May 12, 1998, and the petition of respondent Holly Keifer for review by the Supreme Court was denied July 22, 1998.
 

 [1]
 

 According to RSC, Rancho San Carlos is a “20,000 acre property slated for development with approximately 350 houses.” RSC describes the Ordinance as “a zoning amendment to allow a small resident-serving commercial center at Rancho San Carlos.”
 

 [2]
 

 The Registrar had assigned an exception code to each category of signature which had been disqualified or invalidated during the Registrar’s examination process.
 

 [3]
 

 This court has taken judicial notice of the Board of Supervisors’ resolution, dated September 6, 1996. The Registrar submitted this information to this court in response to questions during oral argument.
 

 [4]
 

 As noted earlier, the trial court determined that the Registrar should have counted 367 signatures that the Registrar had considered invalid. Seven of those three hundred sixty-seven signatures are not at issue in this appeal.
 

 [5]
 

 Although the Registrar does not seek to nullify the results of the election, he argues that the issues regarding the proper counting of signatures on referendum petitions should be addressed because they are certain to occur again and are matters of substantial public importance.
 

 [6]
 

 A11 further statutory references are to the Elections Code unless otherwise specified.
 

 [7]
 

 Section 9114 provides: “Except as provided in Section 9115, within 30 days from the date of filing of the petition, excluding Saturdays, Sundays, and holidays, the elections official shall examine the petition, and from the records of registration ascertain whether or not the petition is signed by the requisite number of voters. A certificate showing the results of this examination shall be attached to the petition. [¶] In determining the number of valid signatures, the elections official may use the duplicate file of affidavits maintained, or may check the signatures against facsimiles of voters’ signatures, provided that the method of preparing and displaying the facsimiles complies with law. [¶] The elections official shall notify the proponents of the petition as to the sufficiency or insufficiency of the petition. [¶] If the petition is found insufficient, no further action shall be taken. However, the failure to secure sufficient signatures, shall not preclude the filing of a new petition on the same subject, at a later date. [¶] If the petition is found sufficient, the elections official shall certify the results of the examination to the board of supervisors at the next regular meeting of the board.”
 

 [8]
 

 With regard to category (1), RSC states that it supports the Registrar’s position and defers to his argument on that issue. In category (5), RSC refers to nine signatures while the Registrar refers to eight. The trial court’s findings provide for eight.
 

 [9]
 

 For elections purposes, the definition of “residence” is set forth in section 349, as follows: “(a) ‘Residence’ for voting purposes means a person’s domicile. [¶](b) The domicile of a person is that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. At a given time, a person may have only one domicile. [¶](c) The residence of a person is that place in which the person’s habitation is fixed for some period of time, but wherein he or she does not have the intention of remaining. At a given time, a person may have more than one residence.”
 

 [10]
 

 Section 105 was originally enacted in 1981 as section 45. It was renumbered effective January 1, 1994, as section 105, and the substance remained unchanged.
 

 [11]
 

 The 1981 Assembly Bill analysis of section 105 (formerly section 45) states: “The current practice of all county clerks when verifying signatures on a petition or nomination paper is to declare those signatures ‘not sufficient’ when the residence address on the petition or paper is not the same residence address that appears on the affidavit of registration. This practice, though not expressly stated in the Elections Code, is supported by case law which provides a clerk may reject the signature of a person whose address appearing on the petition differs from the address shown on his affidavit of registration.
 
 Schaaf v. Beattie
 
 (1968) 265 C.A.2nd 904. [¶] AB 2150 would codify this long-standing court decision and provide that a clerk shall not count a signature as valid when the residence address on the petition or paper is different from that of the affidavit of registration.”
 

 [12]
 

 Section 2204 provides: “Notwithstanding any other provision of law, whenever a voter changes his or her residence within the same precinct, the voter’s affidavit of registration shall not be cancelled. Whenever notified by the voter, the elections official shall change the voter’s affidavit of registration to reflect the new residence address within the same precinct.”
 

 [13]
 

 Section 2102, subdivision (b) provides: “For purposes of verifying signatures on a recall, initiative, or referendum petition ... a properly executed affidavit of registration shall be deemed effective for verification purposes if both (a) the affidavit is signed on the same date or a date prior to the signing of the petition or paper, and (b) the affidavit is received by the county elections official on or before the date on which the petition or paper is filed.”
 

 [14]
 

 The Registrar refers to eight signers in this category while RSC refers to nine. According to Keifer, the discrepancy is the result of a stipulation that one signature was valid. In any event, we review the trial court’s findings, which provide for eight.
 

 [15]
 

 With regard to the review of petition signatures, the Supreme Court set forth the standard of review for such factual determinations in
 
 Wheelright
 
 v.
 
 County of Marin, supra,
 
 2 Cal.3d at page 456: “Where the signature on the petition is obviously spurious and is not that of the voter as shown by the registration affidavit, the clerk may and must reject it. He has no discretion to certify a spurious signature. Where there are dissimilarities which are so minor as to make the clerk’s rejection of the signature an unreasonable or arbitrary act, the court may not accept the clerk’s determination. Where, as here, the dissimilarities are not so minor and the similarities are not so great that only one conclusion can be made as to the validity or invalidity of the signature, and where the court finds that in acting upon these dissimilarities and other indicia the clerk was not acting unreasonably or arbitrarily in finding them spurious, the court must accept the clerk’s determination. . . . The court in mandamus proceedings may review his certification. Where it finds that the clerk has acted reasonably and has not acted arbitrarily or fraudulently, it must accept his determination.”
 
 (Ibid.)
 
 Although the court in
 
 Wheelright
 
 specifically considered the election official’s review of signatures, this standard of review also applies to other factual determinations made by the Registrar.
 

 [16]
 

 The Secretary of State’s guidelines provide that if the address of a signer is written in by someone other than the signer, the signature should not be verified.
 

 [17]
 

 In its amended statement of decision, the trial court found that eight signatures “all substantially complied because their signatures matched and there were extraneous circumstances such as advanced age or physical disability which made it difficult for some of these persons to affix their own address to the petition themselves.”
 

 [18]
 

 RSC argues that the defects in the petition in
 
 Chase
 
 were merely “technical,” but the defects in this case are “jurisdictional.” We do not find this distinction helpful. In both cases the defects, if properly analyzed by the trial court, would have prevented the referendum measure from being on the ballot.
 

 [19]
 

 Because the Ordinance is without effect, we need not consider RSC’s argument regarding the effective date of the Ordinance.