[S.F. No. 22684. In Bank. Apr. 16, 1970.]

GEORGE W. WHEELRIGHT et al., Plaintiffs and Appellants, v.
COUNTY OF MARIN et al., Defendants and Respondents;
GULF OIL CORPORATION OF CALIFORNIA et al., Interveners and
Respondents.

COUNSEL

Robert P. Praetzel, Douglas P. Ferguson and Martin J. Rosen for Plaintiffs and Appellants.

Douglas J. Maloney, County Counsel, Bagley, Bianchi & Sheeks, Bagshaw, Martinelli, Weissich & Jordan, John W. Rosenberg and E. Warren McGuire for Defendants and Respondents and for Interveners and Respondents.

## OPINION

**McCOMB, J.**—This is a judgment roll appeal from a judgment denying a peremptory writ of mandamus and discharging the alternative writ theretofore issued.

Petitioners, registered voters of the County of Marin, on behalf of themselves and others similarly situated sought a writ of mandate to compel the county clerk to certify that a referendum petition had attached to it the requisite number of signatures of registered, qualified electors of the county. The petition as filed contained 6,719 signatures. A minimum of 6,090 was required to qualify it.[1] Section 5152 of the Elections Code requires that

---

[1]Elections Code, section 3752 provides that if a petition protesting against the adoption of an ordinance is presented to the board of supervisors prior to the effective date of the ordinance, the ordinance shall be suspended and shall be recon-

within 10 days from the date of filing the petition the clerk shall examine it, ascertain whether or not it is signed by the requisite number of voters and attach his certificate showing the result of his examination. The clerk's certificate showed only 5,774 qualified signatures. Petitioners alleged that the clerk had rejected, for reasons unknown to them, 944 signatures of duly registered and qualified voters of the county and that the clerk had wrongfully and unlawfully certified to the board of supervisors that a legally deficient number had signed the petition.

The referendum petition protested the adoption of Ordinance No. 1507, approved by the board of supervisors of Marin County on April 12, 1966. In 1965 the county had by ordinance rezoned 2,200 acres of land to P-C (planned community) and by resolution of the board had adopted a Master Plan for the development of this community to be known as "Marincello." Under Marin County Code section 22.44.040 the board and the planning commission were required to approve a precise development plan for any land improvement within the planned community. Ordinance No. 1507 approved a precise development plan for the construction of the Tennessee Valley access road into Marincello. The owners and developers were allowed to intervene as defendants in this proceeding. Their answer alleged that there were an additional 934 signatures on the petition which should not have been allowed by the clerk. During the proceeding they raised the objection that this ordinance related only to administrative duties of the board and was not subject to referendum. The parties by stipulation agreed that, pending determination of the validity of the rejected signatures, the court should not determine whether the ordinance was subject to referendum proceedings or whether some of the allowed signatures contained irregularities which would compel their disallowance.

The transcript indicates that the hearings took several weeks; that witnesses were called and examined; that the court ordered the production of all registration cards and that it examined each of the signatures on the petition together with the corresponding signatures on registration cards; that the legal issues were extensively briefed; and that there were frequent colloquies between court and counsel. In its Memorandum and Minute Order of January 11, 1967, the court stated that it considered the first problem which it must consider in reviewing the clerk's action was whether he had correctly applied the law; the second problem was the question of identification, i.e., was there sufficient similarity between the signature on the petition and that on the registration card to enable the clerk, acting as a reasonable person, to determine that the signer was the registered voter

---

sidered. The petition must be signed by voters of the county equal to at least 10 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election. The clerk certified that 60,901 persons had so voted.

in question. The clerk's judgment in this area of identification must be respected, the court stated, unless it appeared that the clerk rejected a signature for some fancied dissimilarity and "the Court must not seek to make the identification for him. I believe this to be the approach to be taken in this case regardless of whether the pleadings contain particular semantic formulas relating to alleged fraud or arbitrary or capricious action."

The Memorandum Opinion of April 27, 1967, states that the court grouped the disputed signatures into four general categories, a to d. The "c" group contained 94, each of which had been rejected by the clerk initially for reasons which the court found did not constitute a proper basis for disqualification. At the hearing the clerk testified that he nevertheless would have rejected each of these on the ground that a comparison of the handwriting on the petition with that on the registration affidavit left him unsatisfied that the petition was in fact signed by the voter. He testified that in each case he was convinced because of the handwriting dissimilarity that the signature on the petition was not that of the voter in question. The court examined each of these signatures and stated that there were sufficient similarities so that it would be reasonable to conclude that the same person had signed the petition; and that if the court were checking signatures it would resolve such doubt as did exist in favor of the validity of the signature, if it had the power to substitute its judgment for that of the clerk. It determined that it had no such power, unless the similarities were so great or the dissimilarities so minor as to make the clerk's rejection unreasonable or arbitrary.

The clerk rejected 58 names as duplicates. The Memorandum Opinion indicates that petitioners had testified that they had carefully checked the petition and could not find the claimed duplicates, that the clerk had testified as to the procedures employed by his office to discover duplications, and that it was a question "which side the court believes made the more accurate check."

Findings of Fact and Conclusions of Law were filed September 5, 1967. The court found that petitioners had conceded at the trial that 474 signatures were properly disallowed; and that the clerk had restored at the trial 238 signatures originally disallowed by him.[2] These findings are not chal-

---

[2]Finding VIII:
(a)   42   no affidavits of registration found at the time of examination, but were found at time of trial.
(b)  146   omission of dates, dates added by others, use of initials, failure to use given names.
      17   irregularities in affidavit of circulation.
       7   out-of-county registration.
(d)   26   use of name other than given name, resulting in indexing problem.

lenged on this appeal. The court found that 233 signatures were properly rejected by the clerk for the following reasons: 58 were duplicates; 94 had handwriting dissimilarities and that there was difference of opinion between the clerk and the court on these, but that the clerk's rejection thereof was not unreasonable or arbitrary;[3] 31 had handwriting dissimilarities, and the court agreed with the clerk's determination; and on 50 "no affidavits of circulation whatsoever attested their validity." The petition was found to be signed by not more than 6,012 voters. The court found that at all times mentioned the clerk acted in good faith, in an honest, fair and reasonable manner, and in no instance could any of his actions be deemed arbitrary or capricious.

On this appeal petitioners urge that the court erred as a matter of law in deferring to the clerk's opinion that 94 signatures were not authentic and that 58 signatures were duplicates, and in deferring to his "improper rejection of petitions containing valid signatures because of some alleged defect in the circulator's affidavit."

■ In a judgment roll appeal every presumption is in favor of the validity of the judgment and any condition of facts consistent with its validity will be presumed to have existed rather than one which will defeat it. (*Johnson* v. *Hayes Cal Builders, Inc.* (1963) 60 Cal.2d 572, 578 [35 Cal.Rptr. 618, 387 P.2d 394].) ■ The sufficiency of the evidence to support the findings is not open to review. (*DeVries* v. *Brumback* (1960) 53 Cal.2d 643, 647-648 [2 Cal.Rptr. 764, 349 P.2d 532].) It must therefore be presumed that the evidence was sufficient to support the findings that as to the 94 signatures in the "c" group the similarities were not so great, and the dissimilarities were not so minor as to make the clerk's rejection unreasonable or arbitrary; that 58 signatures were duplicates; and that there were no affidavits of circulation whatsoever attesting the validity of 50 signatures. Affidavits of circulation are required (Elec. Code, § 3701; former Cal. Const., art. IV, § 1).

California Constitution, article IV, section 1, prior to its repeal and reenactment on November 8, 1966 (now art. IV, § 25)[4] reserved to the

---

[3]The finding reads: "On the basis of an apparent dissimilarity in handwriting and other indicia, the Clerk was not reasonably satisfied that the signers were registered voters. In the case of these signatures the court stated that while a dissimilarity was apparent, it felt that there was sufficient similarity so that it would be reasonable to conclude that the same person had signed the petition and that if the court were checking signatures it would resolve such doubt as did exist in favor of the validity of the signature. In substance, the court indicated that if it had the power to substitute its judgment for that of the Clerk as to the identity of handwriting it would allow the signature. However, the similarities were not so great nor the dissimilarities so minor as to make the Clerk's rejection unreasonable and/or arbitrary."

[4]Constitution, article IV, section 25 (added Nov. 8, 1966): "Initiative and

people the power of the initiative and the referendum and specifically reserved such powers to the electors of each county "to be exercised under such procedure as may be provided by law." This section was declared to be self-executing, "but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved." It requires that each section of a petition have attached to it the affidavit of the person soliciting signatures to the same, stating his own qualifications, and stating that all of the signatures to the attached section were made in his presence, and that to the best of his knowledge and belief each such signature is the genuine signature of the person whose name it purports to be, and no other affidavit thereto shall be required. The affidavit must be verified. The petitions so verified "shall be prima facie evidence that the signatures thereon are genuine and that the persons signing the same are qualified electors. Unless and until it be otherwise proven upon official investigation, it shall be presumed that the petition presented contains the signatures of the requisite number of qualified electors."

Facilitating legislation has been enacted by the Legislature, the provisions for initiative and referendum in county elections being provided in section 3700 et seq. of the Elections Code. Section 3701 requires that each signer of a petition add to his signature his place of residence; provides that the signatures need not all be appended to one paper; requires that each separate paper have attached an affidavit made by a voter of the county stating that he circulated that particular paper and saw written the signatures appended to it and that according to his best information and belief each such signature is the genuine signature of the person whose name it purports to be and that the signer is a voter of the county. Section 3707 requires the county clerk to examine the petition within 10 days from date of filing and from the records of registration ascertain whether or not the petition is signed by the requisite number of voters. He must attach his certificate showing the result of his examination. Provision is made for the filing of a supplemental petition, bearing additional signatures, if the clerk's certificate shows that the original petition has insufficient signatures, and this supplemental petition must be examined by the clerk within 10 days after it is filed, and he must certify the results of his examination. If the petition is found to be sufficient he must submit it to the board of supervisors at its next regular meeting.

These duties are ministerial but they are not mechanical. They involved more than a computation of the number of signatures. Some

referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. This section does not affect a city having a charter."

judgment on the part of the clerk is required. Each signature on the petition must be handwritten and he must compare this handwriting with that on the registration affidavit to determine if it is the handwriting of the voter. He must use his eyesight and critical faculties to determine whether sufficient similarities exist for him to certify that this is a valid signature. If he certifies that the petition contains the requisite number of valid signatures, the board of supervisors must submit the ordinance, without alteration, to the voters at the next general election (Elec. Code, § 3711). ■ His petition is therefore prima facie correct. It is not conclusive, however, and may be challenged and reviewed by a court in mandamus proceedings. (*Ley* v. *Dominguez* (1931) 212 Cal. 587 [299 P. 713].)

We turn, then, to a consideration of whether errors of law occurred in the mandamus proceedings which require reversal by this court.

■ Questions: *First. Did the court err in accepting the clerk's determination that these 94 signatures were invalid?*

*No.* Where the signature on the petition is obviously spurious and is not that of the voter as shown by the registration affidavit, the clerk may and must reject it. He has no discretion to certify a spurious signature. ■ Where there are dissimilarities which are so minor as to make the clerk's rejection of the signature an unreasonable or arbitrary act, the court may not accept the clerk's determination. ■ Where, as here, the dissimilarities are not so minor and the similarities are not so great that only one conclusion can be made as to the validity or invalidity of the signature, and where the court finds that in acting upon these dissimilarities and other indicia the clerk was not acting unreasonably or arbitrarily in finding them spurious, the court must accept the clerk's determination. This view of the law does not conflict with the provisions of former section 1, of article IV of the California Constitution that a referendum petition, when verified by the affidavit of the circulator, is prima facie evidence that the signatures thereon are genuine and that the persons signing the same are qualified electors. Thereafter the clerk must make *his* determination of the genuineness thereof. ■ He is limited in his comparison of the signatures and may not go outside the registration affidavit to determine this. (*Ley* v. *Dominguez, supra,* 212 Cal. 587, 596; see *Ratto* v. *Board of Trustees* (1925) 75 Cal.App. 724, 726 [243 P. 466]; see *Schaaf* v. *Beattie* (1968) 265 Cal.App.2d 904, 910 [72 Cal.Rptr. 79], hearing denied by this court Nov. 20, 1968, as to limitations on clerk's determination of residence qualifications.) ■ The court in mandamus proceedings may review his certification. Where it finds that the clerk has acted reasonably and has not acted arbitrarily or fraudulently, it must accept his determination.

*Second. Did the court err in not allowing the petitioners to produce evidence that the 94 signatures were in fact genuine?*

*No.* The exercise of jurisdiction in mandamus rests to a considerable extent in the wise discretion of the court. (*Fawkes* v. *City of Burbank* (1922) 188 Cal. 399, 401 [205 P. 675].) The control of the proceedings rested in its discretion. The minute order of March 14, 1967, indicates that petitioners submitted their cause, and then stated they would present an offer of proof in writing. Minute order of March 21 shows motion by defendant county for judgment; the court's statement that it was ready to grant the motion but felt that it should grant petitioners a chance to present their offer of proof; that offer of proof was made; and that petitioners requested permission to reopen the cause to allow them to call in all of the 94 persons in the "c" group. The motion was denied on objection by defendant. The court gave petitioners 10 days to further research the authorities, the matter to be submitted at the end of 10 days. There is nothing in the record to show that the court erred in denying the motion to reopen or rejecting the offer of proof.

Petitioners urged before the trial court and on appeal that they had been misled by the trial court into believing that it had approved the 94 signatures, and that the court had reversed its earlier ruling on signature authenticity only after they had rested their case. These contentions are reviewed by the court in its memorandum opinion of April 27, 1967. The court stated therein that throughout the proceedings it had ruled that the clerk's judgment in the area of identification must be upheld, even though the court if acting independently might have found the signatures valid, and that the court could not make the determination for the clerk unless it found that he had acted fraudulently or arbitrarily. There is nothing in the record before us to indicate that the parties did not have every opportunity to litigate their objections to the clerk's certificate.

*Third. Is the ordinance in question subject to referendum proceedings?*

*Yes.* The ordinance was pleaded in full in the petition for writ of mandate. The power of referendum may be invoked only with respect to matters which are strictly legislative in character (*Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 834 [323 P.2d 71]). It may not be invoked with regard to those matters which are strictly executive or administrative. (*Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 557 [219 P.2d 457].) This type of ordinance has generally been held to be legislative. (See *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 613-614 [150 P. 977].) The original ordinance authorized the establishment of "Marincello" as a planned community. The referendum was sought against a subsequent ordinance for the construction of

an access road. Intervenors argue that this ordinance was passed merely for the purpose of giving effect to the previously declared legislative policy and was administrative, not legislative. Roadways are of sufficient public interest and concern to weight the scales in favor of construing this ordinance as being legislative and to be well within the referendum powers reserved by the people.

It is not necessary to here decide whether the court should have heard intervenors' objections to signatures which had been allowed by the clerk. That issue was removed from the trial by stipulation, not to be heard unless the petition was found to have sufficient signatures to validate it. It was not so found.

Judgment affirmed.

Burke, J., Draper, J.,* and Molinari, J.,* concurred.

**MOSK, Acting C. J.**—I dissent.

While I agree with the holding that the ordinance in question is subject to referendum proceedings, I dissent from the remainder of the discussion and particularly from the conclusions reached in the majority opinion. The opinion concludes: (1) that the trial court properly upheld the clerk's determination that 94 signatures on the referendum petition were invalid because, although the clerk's conclusion was arguably incorrect, the similarities of the signatures were not so great or the dissimilarities so minor as to render the clerk's rejection unreasonable or arbitrary; and (2) that this is an appeal on a judgment roll and therefore the sufficiency of the evidence to support the findings is not open to review.

As we shall see, these conclusions are incorrect since the law clearly declares that the burden of proof was upon the clerk to establish the signatures were not genuine and it affirmatively appears on the face of the record that the trial court failed to require the clerk to meet this burden. That the evidence may have been sufficient under the trial court's inappropriate standard cannot justify this court in upholding the judgment.

The initiative and referendum are powers reserved to the people, not powers granted to them. (Cal. Const., art. IV, § 1.) For this reason statutes dealing with the referendum should be afforded the same liberal construction accorded to election statutes so that citizens may, whenever possible, be protected in the exercise of their reserved power. (*Ley* v. *Dominguez* (1931) 212 Cal. 587, 593 [299 P. 713].) As was said in *McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787], "The right of initiative

---

*Assigned by the Chairman of the Judicial Council.

is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter." The clerk must perform his duties in such manner as will, whenever possible, protect rather than defeat the right of the people to exercise their referendary power. (*Ley* v. *Dominguez* (1931) *supra,* 212 Cal. at p. 602.)

Consistent with this long-prevailing policy the Elections Code establishes a rebuttable presumption that the signatures on initiative and referendum petitions are genuine. Section 3514 of the Elections Code provides that verified initiative and referendum petitions "shall be prima facie evidence that the signatures thereon are genuine and that the persons signing the same are qualified electors. Unless and until it be otherwise proven upon official investigation, it shall be presumed that the petition presented contains the signatures of the requisite number of qualified electors."[1] (Evid. Code, § 602.) The presumption imposes upon the party attacking the genuineness of the signatures on a referendum petition, here the clerk and the intervenors, the burden of proving that the signatures are not genuine. (Evid. Code, § § 605, 606.) In other jurisdictions, too, the burden of proof is upon the person or agency attacking the validity of signatures on election petitions. (See, e.g., *In re Initiative Petition No. 260, State Question No. 377* (Okla. 1956) 298 P.2d 753, 757; *Woodward* v. *Barbur* (1911) 59 Ore. 70 [116 P. 101, 103-104]; *State* v. *Black* (1964) 149 W.Va. 124 [139 S.E.2d 166, 171]; see 42 Am.Jur.2d 704; 5 McQuillin, Municipal Corporations (3d ed.) p. 235.)

The majority opinion, in holding that the clerk has met his burden by a bare assertion of the invalidity of the signatures and a showing that his conclusion was not unreasonable or arbitrary, eviscerates the presumption of validity which should be accorded to the signatures. It is not surprising that no authority is cited in the opinion for this startling inversion of legislative intent, for the cases have stated or held not only that the burden of demonstrating the invalidity of signatures on a petition is upon the person protesting their genuineness but also that it is for the trial court rather than the clerk to determine whether the signatures are genuine. Thus it has been said that the question whether fraud has been committed is not for the clerk but for a court of equity in appropriate proceedings. (*Ley* v. *Dominguez* (1931) *supra,* 212 Cal. 587, 602; *Williams* v. *Gill* (1924) 65 Cal.App. 129, 132 [223 P. 559].)

In recognition of this rule a number of cases have held that the trial court must take evidence and make findings of fact upon the question whether signatures on a petition are genuine. (See, e.g., *Ratto* v. *Board of Trustees*

---

[1]The presumption was previously contained in article IV, section 1, of the California Constitution, repealed on November 8, 1966.

(1925) 75 Cal.App. 724, 727-728 [243 P. 466]; *City of Watts* v. *Superior Court* (1918) 36 Cal.App. 692, 698 [173 P. 183].) Authorities in other jurisdictions are in accord. (*State* v. *Carter* (1914) 257 Mo. 52 [165 S.W. 773, 780-781]; *In re Initiative Petition No. 23* (1912) 35 Okla. 49 [127 P. 862, 864-865]; *State* v. *Olcott* (1912) 62 Ore. 277 [125 P. 303]; *State* v. *Garner* (1962) 147 W.Va. 293 [128 S.E.2d 185, 190]; see also *State* v. *Rupert* (1918) 99 Ohio St. 17 [122 N.E. 39, 40]; *Hindman* v. *Boyd* (1906) 42 Wash. 17 [84 P. 609, 613].). None of these cases indicate that the court must defer to the judgment of the official charged with examining the petition unless his acts are unreasonable or arbitrary. Indeed, reported decisions which recite evidence indicate clearly that the persons who protested the signatures were compelled to introduce evidence to prove their assertion of invalidity.[2]

The wisdom of these rules is graphically illustrated by the circumstances of the present case. The clerk initially disqualified the 94 signatures in issue on grounds other than the genuineness of the signatures. When the trial court held that the grounds of disqualification were improper, the clerk then stated that he would have refused to certify the signatures as valid in any event because a comparison of each signature on the petition with the registration affidavit of the voter indicated to him that the signer of the petition was not the voter in question. Although the judge disagreed with this conclusion, he indicated he had no power to substitute his opinion for that of the clerk since the similarities were not so great or the dissimilarities so minor as to render the clerk's determination unreasonable or arbitrary.

No evidence aside from the opinion of the clerk or his deputies was introduced at the trial to support his conclusion. No attempt was made to contact the signatories to determine if they had in fact signed the petition for the purpose of disproving their signatures at the trial. In other words, the clerk's burden of proof was held by the trial court to be satisfied by his *ipse dixit* statement that the signatures were not genuine.

Justification for requiring the clerk to prove the invalidity of the signatures is supported by the unlikelihood under the circumstances of the present case that the signatures were forged. The documents contained in the record show that the signatures in question appear at random on numerous petitions circulated by a large number of persons. Each circulator attached an affidavit asserting upon information and belief that the signa-

---

[2]In *State* v. *Olcott, supra,* the evidence of handwriting experts was introduced to prove invalidity and in *In re Initiative Petition No. 23, supra,* the official who refused to certify the petition attempted to contact the persons whose allegedly forged signatures appeared thereon.

tures were genuine and that each signer was a voter in the county. (Elec. Code, §§ 3701, 3754.) I have examined a sampling of signatures which the clerk held to be invalid after comparing them with the signatures on the affidavits of registration. It is evident from an inexpert comparison of these signatures why the trial court expressed the personal opinion that the signatures on the petitions were genuine. In view of the very close resemblance of these petitioners' signatures on the petition with their affidavits of registration, the likelihood of forgery appears minimal. It would have to be assumed that some persons examined certain affidavits of registration at random to ascertain the appearance of the signatures of certain voters and that they then signed these names to various petitions also chosen at random. Or, in the alternative, we would be required to speculate that 94 persons who were familiar with the signatures of these voters, in their enthusiasm for the proposal set forth in the referendum petition, forged the names of the voters on the petition.[3]

It must be remembered that the Elections Code makes it a felony punishable by up to 14 years in prison to subscribe or cause one to subscribe the name of another to a referendum petition (Elec. Code, § 29221) and that it is a crime for the circulator to make a false affidavit attesting to the genuineness of a signature on a petition (Elec. Code, § 29218) or to file a petition with a false signature (Elec. Code, § 29216).[4] While I do not imply that forgeries never occur, the unlikelihood of one risking serious penal sanctions supplies ample justification, if justification is necessary, for the legislative policy of placing the burden of proving that a signature is not genuine on the person who protests its validity.

As we have seen, the clerk is enjoined to perform his duties in such a manner as will, whenever possible, protect rather than defeat the right of the people to exercise their referendary power. (*Ley* v. *Dominguez* (1931) *supra*, 212 Cal. 587, 602.) He must consider that the signing of a petition is not accomplished with the same formalities as the attestation of a will. It was said in *Chester* v. *Hall* (1921) 55 Cal.App. 611, 617 [204 P. 237], " 'Those who circulate the petition will necessarily be drawn from the

---

[3]We would also be required to attribute to those who allegedly falsified the signatures an uncommon degree of carelessness. Initially, all these signatures failed to meet with the clerk's approval for some reason other than authenticity. Presumably, the persons who took the trouble to forge the names failed in some respect to follow the requirements for a proper signature as to every one of the asserted forgeries.

[4]In other jurisdictions where there is no statutory presumption of genuineness of the signatures on a petition the presumption is held to arise as a matter of law from the prohibitions against forgery and the requirement of verification. (*State* v. *Carter, supra,* 165 S.W. 773, 780; *Tyler* v. *Secretary of State* (1962) 229 Md. 397 [184 A.2d 101, 103-104]; *State* v. *Olcott, supra,* 125 P. 303, 307; *Woodward* v. *Barbur, supra,* 116 P. 101, 103-104; *Rousso* v. *Meyers* (1964) 64 Wn.2d 53 [390 P.2d 557, 560].)

ranks of volunteers or those who, for a very small consideration, call attention to their fellow-citizens to the measure proposed, and solicit their interest therein. Necessarily, even with the best safeguards that can be thrown around the circulation of petitions, where such a large number of names are required, inaccuracies and technical departure from prescribed forms are certain to occur every time a petition is circulated. *The people who sign the petitions often, if not generally, lack both convenience and the best writing materials to distinctly, legibly, and permanently attach their names thereto.* All of these things are proper to be noted and taken into consideration in the administration of this law. It can be made effective or defeated by the officers charged with its administration, and it is our duty to sustain it, rather than destroy, if it can be accomplished within the law.' " (Italics added.)

The trial court's error in the present case was compounded by its refusal to permit petitioners to produce evidence that the signatures were genuine. Leaving aside for the moment the question whether petitioners should have been barred from introducing such evidence because they did not promptly assert their desire to do so,[5] the court did not reject the offer of proof because it was tardy. The record establishes that petitioners attempted to introduce affidavits of the signatories attesting to the genuineness of the signatures and also offered to introduce testimonial evidence to the same effect. In its memorandum opinion the trial court indicated that the rejection of this offer was based on the court's conclusion that such evidence was irrelevant in view of the clerk's determination that the signatures were forgeries.[6] A clearer violation of a voter's right to exercise the power of referendum reserved to him under the Constitution is difficult to conceive.

One other matter should be noted. The clerk contends that if the trial court must go beyond a determination of whether he acted reasonably, courts will be burdened with an incredibly complex and time-consuming task since a referendum petition could contain hundreds of thousands of

---

[5]After some days of trial the court announced that it ruled in favor of petitioners on the 94 signatures in question and that borderline cases had been resolved in their favor. The court stated in its memorandum opinion that this conclusion was intended to apply not to handwriting comparison but to other reasons initially advanced by the clerk for disqualifying the signatures, such as the failure to add an address, the use of initials, or some other technical defect.

[6]The court stated in its memorandum opinion with regard to the petitioners' claim that they should have been permitted to introduce evidence regarding the genuineness of the signatures, ". . . it is difficult to envision what further examination could have been conducted. In every case the signatures were personally examined and compared by the court. In many cases the court agreed with the Clerk. In all cases dissimilarities were apparent which . . . were given greater significance by the Clerk than by the court. But in every case the reason for the Clerk's action was apparent from the comparison alone."

signatures. This argument is without substantial merit. The number of signatures disqualified by the clerk may indeed be large but only a small proportion of these would be disqualified because of an allegedly forged signature.

Under existing law, as the majority opinion admits (*ante,* p. 456),[3] the clerk's determination as to the sufficiency of a petition is not conclusive and may be challenged and reviewed by a court in a mandamus proceeding. The instant case is probably a fairly typical illustration of proceedings when the clerk's factual determination is challenged. Here the clerk initially disqualified 944 signatures out of 6,719. Of these, petitioners conceded that 474 were properly disallowed and the clerk conceded that he had erred as to 42 signatures which he should have allowed. A considerable body of case law has evolved in California on the question whether various defects in referendum petitions justify the clerk's refusal to validate signatures thereon. For example, in *Ley* v. *Dominguez* (1931) *supra,* 212 Cal. 587, 597, it was held that the failure by a signer to insert a precinct number after his name did not invalidate his signature and in *Chester* v. *Hall* (1921) *supra,* 55 Cal.App. 611, 618-619, it was held that the absence of a date after the signature did not disqualify the signature. The clerk restored over 200 signatures after the standards set forth in these and other cases were applied by the court.

This left only 233 signatures in question and of these 108 were invalidated because of asserted duplication of names and the absence of a circulator's affidavit. Only 125 were rejected because the signatures were assertedly not genuine.[7] Thus, ultimately, over 98 percent of the signatures on the petition were either found to be sufficient before trial or were restored during trial by the concession of the parties or the application of established rules.

In these 125 individual instances, we do not face difficult evidentiary situations in which the signers of a document are deceased or otherwise unavailable and the genuineness of signatures must be proved by others. Here the voters who signed the petitions are alive and well, and anxious to affirm the exercise of their referendum rights by sworn testimony that each in fact personally signed the petitions in question, but they are restrained from doing so only because a county official is of the opinion from a comparison of signatures with the affidavits of registration that the signatures were forged. This incomprehensible result can only chill the faith of registered voters in the rationality of the democratic process.

---

[7]These 125 signatures consist of the 94 discussed above and 31 additional signatures as to which the trial court agreed with the clerk's determination of dissimilarity.

The United States Supreme Court has been increasingly solicitous of protecting the right of franchise against interference by the states. (See, e.g., *Louisiana* v. *United States* (1965) 380 U.S. 145 [13 L.Ed.2d 709, 85 S.Ct. 817]; *Harman* v. *Forssenius* (1964) 380 U.S. 528 [14 L.Ed.2d 50, 85 S.Ct. 1177]; *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; *Wesberry* v. *Sanders* (1964) 376 U.S. 1 [11 L.Ed.2d 481, 84 S.Ct. 526]; *Gray* v. *Sanders* (1963) 372 U.S. 368 [9 L.Ed.2d 821, 83 S.Ct. 801].) The holding of the majority opinion is inconsistent with the underlying rationale of these decisions. It exalts form—the opinion of a public servant—over substance—the acts of electors.

I would reverse the judgment.

Peters, J., and Sullivan, J., concurred.

Appellants' petition for a rehearing was denied May 21, 1970. Draper, J.,* sat in place of Tobriner, J., who deemed himself disqualified. Peters, J., Mosk, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.