[No. A115674. First Dist., Div. Two. Dec. 12, 2007.]

FRIENDS OF BAY MEADOWS et al., Plaintiffs and Appellants, v.
CITY OF SAN MATEO et al., Defendants and Appellants;
WARREN SLOCUM, as Chief Elections Officer, etc., Defendant and
Respondent;
BAY MEADOWS LAND COMPANY, Appellant.

[No. A115503. First Dist., Div. Two. Dec. 12, 2007.]

SUZANNE FLECKER et al., Plaintiffs and Appellants, v.
NORMA GOMEZ, as City Clerk, etc., et al., Defendants and Respondents;
FRIENDS OF BAY MEADOWS, Real Party in Interest and Respondent.

1176

1178

Counsel

Stuart M. Flashman for Plaintiffs and Appellants Friends of Bay Meadows et al., and for Real Party in Interest and Respondent.

Shawn M. Mason, City Attorney, Michael J. Ogaz and Bahareh Abdollahi, Deputy City Attorneys, for Defendants and Appellants and for Defendants and Respondents Norma Gomez et al.

Howard Rice Nemerovski Canady Falk & Rabkin, Steven L. Mayer; Remcho, Johansen & Purcell, Robin B. Johansen and Thomas A. Willis for Appellant Bay Meadows Land Company and for Plaintiff and Appellant Suzanne Flecker.

Thomas F. Casey III, County Counsel, and Brenda B. Carlson, Chief Deputy County Counsel, for Defendant and Respondent Warren Slocum.

Opinion

RICHMAN, J.—Before us are three appeals from two superior court judgments in different cases, all involving a single subject, namely, the decision of county election officials not to certify a referendum to overturn a measure adopted by the San Mateo City Council, which decision resulted from the election officials' invalidation of a number of categories of purported voter signatures. The officials' decision was upheld by the trial court.

The parties raise a number of claims concerning the officials' determinations on various categories of disqualified signatures. We find it necessary to decide only one of those claims: whether the officials properly disqualified 36 signatures where the voter did not personally write out identifying information as required by Elections Code section 100. We agree that the officials acted correctly in this regard, and hold, in this case of first impression, that the deficiency could not be cured by construing Election Code section 100.5 to validate the signatures by the declaration of the petition circulator on each sheet of signatures. In light of this decision, all remaining contentions become moot because, no matter how any of the parties' other contentions are resolved, there would still be an insufficient number of valid signatures to qualify the referendum for submission to the voters. We therefore affirm one judgment and dismiss two of the appeals.

## BACKGROUND

The Bay Meadows racetrack is a prominent feature of the history, economy, and geography of San Mateo County. The racetrack is located on a parcel of approximately 75 acres; an adjoining parcel of about 83 acres is not used for track operations, and was apparently unimproved. Both parcels are owned by Bay Meadows Land Company (Bay Meadows Land Company).

In 1997, the San Mateo City Council (Council) adopted a specific plan for the parcels.[1] It appears that thereafter Bay Meadows Land Company came to believe that the property would be more profitable if the racetrack were closed and other commercial uses were promoted. In November 2005, the Council adopted resolution No. 111 which, among other things, amended the specific plan and approved a master tentative parcel map for the 83-acre parcel. That same month the Council approved a development agreement for creation of a "commercial district with capacity of more than one million square feet of retail, office and service-commercial space."

Opposition to the proposed development was led by an unincorporated association named Friends of Bay Meadows (Friends), which prepared a referendum petition and gathered signatures to put it on the ballot. Friends' attempt failed in early January 2006, when Norma Gomez, the San Mateo City Clerk, and Warren Slocum, the San Mateo County Chief Elections Officer, refused to certify the petition on the ground it lacked the requisite numbers of qualified voters.

On January 23, 2006,[2] Friends commenced the first action, *Friends of Bay Meadows v. City of San Mateo* (San Mateo Super. Ct., No. Civ452450), filing a petition for writ of mandate and complaint against the City of San Mateo (City), Gomez, and Slocum. The principal relief sought was a writ of mandamus directing those respondents "to reverse their disqualification or invalidation" of certain signatures "to correct their certification . . . to indicate that the referendum has qualified." Friends also prayed for declaratory relief "that Elections Code § 105, both facially and as applied under the facts and

---

[1] In addition to its general plan, a city or county is authorized to adopt a specific plan for "the systematic implementation of the general plan for all or part of the area covered by the general plan." (Gov. Code, § 65450.) In addition to certain contents required by statute (*id.*, § 65451), a specific plan "may address any other subjects which in the judgment of the planning agency are necessary or desirable for implementation of the general plan." (*Id.*, § 65452.)

[2] All dates mentioned refer to the calendar year 2006 unless otherwise indicated.

conditions of this case is invalid in that it violates the people's right of referendum under the California Constitution by disallowing the petition signatures of electors and voters who, under Elections Code § 2204, remain duly qualified voters in spite of having moved to another residence within the same precinct . . . ."

Bay Meadows Land Company was not named as a party in Friends' action, and moved to intervene. The motion was denied, following which Bay Meadows Land Company, joined by taxpayer Suzanne Flecker, initiated the second action, their own petition for writ of mandate and complaint in *Flecker v. Gomez* (San Mateo Super. Ct., No. 453728). This action named Gomez and the City as respondents, and Friends as a real party in interest. It alleged that the referendum petition had fatal defects of form that made it invalid even before the gathering of voter signatures began, specifically that the petition "(1) fails to advise potential signers that the referendum is protesting the adoption of an ordinance or resolution, as required by Elections Code section 9237; (2) fails to provide either the number or the correct title of the ordinance or resolution being challenged, as required by Elections Code section 9238; and (3) fails to include the full text and accompanying exhibits of the ordinance or resolution being challenged, as required by the same statute." Like Friends in its suit, this complaint sought a writ of mandate and injunctive relief prohibiting officials "from taking any steps to place Real Parties' referendum on the ballot, submitting it to the voters for approval, or repealing Resolution No. 111 in response to it."

In light of the obvious overlap between the two actions, the trial court effected an informal consolidation by establishing a unified briefing schedule.

The Friends action was resolved first, on the basis of competing motions: Slocum, the City, and Gomez moved "for judgment to dismiss writ of mandate," and Friends filed a "cross-motion to grant peremptory writ of mandate and judgment." The motions were submitted for decision on the basis of argument and stipulated facts which, as relevant here, and with minor editorial adjustments, read as follows:

"1. On November 7, 2005, the San Mateo City Council approved Resolution No. 111 (2005) adopting the Bay Meadows Specific Plan and took certain other related actions. Petitioners and Plaintiffs[3] circulated a 'Referen-

---

[3] By this time Friends had been joined by Gerald P. Krawetz as a named plaintiff, and for purposes of simplicity we shall usually refer to these plaintiffs collectively as Friends.

dum Against An Ordinance/Resolution Passed By The City Council,' 'Bay Meadows Specific Plan Amendment.' ('Petition') and collected signatures.

"2. The Petition was filed with Gomez on December 7, 2005. . . .

"[¶] . . . [¶] 4. On December 15, the petition was received in Slocum's office. It contained 232 petition sections and 5,708 signatures.

"[¶] . . . [¶] 6. The City of San Mateo has 46,610 registered voters as stated in Slocum's last official report of registration dated October 24, 2005 to the Secretary of State prior to the Petition.

"7. Gomez determined that the Petition must have 4,661 . . . signatures to be certified. This represents 10 percent of the registered voters within the City.

"8. Slocum's staff determined the sufficiency of the 5,708 signatures on the Petition . . . by examining the voter registration affidavits, if . . . any, of the signers.

"9. From this examination and subsequent reviews, Slocum has determined the following:

"(a) 5,708 unverified signatures were filed by the proponent of the Petition

"(b) 4,577 signatures were found to be sufficient

"(c) 1,131 signatures were found not to be sufficient

"(d) 529 withdrawal cards were delivered and verified, 88 of which were initially found to be sufficient. Upon a later review, 33 of these 88 cards were determined to be of no effect because they were received by the City Clerk on the same date that the Petition was filed with the City Clerk. The remaining 55 withdraw[al] card signatures are included in the 1,131 signatures found not to be sufficient.

"10. From Petitioners' initial examination and two subsequent examinations of the 1,131 insufficient signatures, Petitioners' contention that addi-

tional signatures found insufficient [which] should have been sufficient is limited to 84, as described in paragraphs 11-16 below.

"11. Slocum determined that 36 signatures were not sufficient because the signer did not personally affix printed name and place of residence on the Petition. The Petition section and line numbers for these petition signatures as well as the copies of the petition signature and corresponding registration affidavit, as well as each of these signer's registration affidavits are attached hereto as Exhibit A.

"12. Slocum found that 29 signatures were not sufficient because the residence address as written on the Petition was different from the residence address on the signer's voter registration affidavit. Of these 29 petition signatures, 10 listed addresses on the petition that do not exist and 18 listed addresses on the petition that are within the same precinct as the address on the signer's voter registration affidavit, and [one] listed an address on the petition that is not with the same precinct as the address on the signer's voter registration affidavit. The Petition section and line numbers and address listings for these petition signatures in question as well as copies of the petition signature and corresponding registration affidavit, are attached hereto as Exhibit B.

"13. Slocum found that 17 petition signatures were not sufficient because the signature on the Petition did not match the signature on the voter registration affidavit. The Petition section and line numbers for these petition signatures in question as well as copies of the petition signature and corresponding registration affidavit, are attached hereto [as] Exhibit C.

"14. Slocum found that [one] petition signature was not sufficient because the person was not a registered voter. The Petition section and line number for this petition signature in question as well as copies of the voter registration affidavit for the individuals registered at the same address are attached hereto in Exhibit D.

"15. Slocum found that [one] petition signature was not sufficient because the signer failed to personally affix her address. The copy of the petition section reflecting this signature and a copy of the registration affidavit for this signer are attached hereto as Exhibit E.

"16. Petitioner Gerald Krawetz is a registered voter residing within the City of San Mateo. His voter registration affidavit states his residence as . . .

in San Mateo. When he signed the petition, he listed . . . a different address within the same precinct. Slocum determined his signature not to be sufficient because the address listed on the Petition was not the same address listed on his voter registration affidavit. His signature is one of the signatures listed in relation to paragraph 12.

"17. Gomez rejected one section of the Petition containing 25 signatures on the basis that the circular's affidavit did not include a full date for the starting date for the petition's circulation. The affidavit for the Petition did not have a complete execution date and did include a statement that signature collection began in November 2005. . . .

"18. Gomez certified that the referendum Petition did not have sufficient signatures in order for it to be considered valid."

On July 27, the trial court filed an order in the Friends case, ruling as follows:

"The Court . . . finds that Respondent Slocum properly determined with respect to the 81 signatures whose validity is in question that: (a) 36 of the signatures were not sufficient because the signer did not personally affix printed name and place of residence, in violation of Elections Code § 100 nor could they be counted as valid under Elections Code § 100.5; (b) 29 of the signatures were not sufficient because the residence address as written on the petition did not match the residence address on the signer's voter registration affidavit, in violation of Elections Code § 105; and (c) Respondent Slocum was not arbitrary or unreasonable in his determination that 12 of the signatures were not sufficient because the signature on the petition did not match the signature on the voter registration affidavit. Based on the above, the Court finds there remain insufficient valid signatures on the petition to qualify the referendum.

"With respect to Petitioners' Cross-Motion to Grant Peremptory Writ of Mandate, the Court finds: (a) that the Elections Office improperly invalidated signature 17 on petition section 17 and signature 29 on petition 121 for non-matching signatures, and signature 6 on petition 210 for failure to personally affix printed place of residence (Elections Code § 105), and these signature[s] shall be counted as valid; and (b) that Respondent Norma Gomez acted improperly in rejecting one petition section, when the contents of the petition clearly indicated it had not been circulated outside of the legally

mandated time period. However, because even if all twenty-five signatures on the unprocessed petition were found valid, there would still not be sufficient valid signatures to qualify the referendum, the Court finds that requiring the petition signatures to be processed for possible validation would be a futile exercise.

"For the reasons set forth above, IT IS HEREBY ORDERED: [¶] (1) Respondent Warren Slocum's Motion to Dismiss the Petition for Writ of Mandate is GRANTED. [¶] (2) Petitioners' Motion to Grant the Writ of Mandate is DENIED in full. [¶] (3) Respondents' City of San Mateo and Norma Gomez' Motion to Dismiss Writ of Mandate is DENIED."

On July 28, the court entered judgment in favor of the City, Slocum, and Gomez. Friends filed a timely notice of appeal from the judgment. The City and Gomez filed a notice of cross-appeal from the judgment "insofar as it denied their Motion to Dismiss Writ of Mandate."

Meanwhile, on July 6, the court entered an order denying the petition of Bay Meadows Land Company and Flecker on the merits. Judgment was entered on September 8, and Bay Meadows Land Company and Flecker filed a timely notice of appeal.

We ordered the appeals coordinated for purposes of briefing and argument. We also granted Bay Meadows Land Company leave to intervene in appeal No. A115674, the Friends appeal from the July 28 judgment.

## DISCUSSION

### I

The California Constitution acknowledges that "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." (Cal. Const., art. II, § 1.) One of the ways in which the people may determine for themselves what "their protection, security, and benefit . . . or the public good may require" is the referendum, which is defined as "the power of the electors to approve or reject statutes or parts of statutes." (*Id.*, § 9, subd. (a).) "[R]eferendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." (*Id.*, § 11, subd. (a).)

██ With respect to municipalities with a population of more than 1,000, the Legislature has provided that when "not less than 10 percent of the voters of the city" sign "a petition protesting adoption of the ordinance," the legislative body that enacted the ordinance may reconsider (i.e., repeal) it; failing that, the decision on the ordinance is made by the voters in a referendum. (Elec. Code,[4] §§ 9237, 9241.) The petitions must conform to a specified standard, and must be circulated by a person who either is, or is qualified to be, a registered voter in the municipality. (§ 9238.) The petitions must also be turned in to the municipal elections official within 30 days of the adoption of the ordinance by the legislative body. (§§ 9239, 9242.) The election official is then required to "examine the petition," determine the total number of valid signatures by registered voters, and "certify the results." (§§ 105, 9239, 9240, 9210.)

██ In *Wheelright v. County of Marin* (1970) 2 Cal.3d 448 [85 Cal.Rptr. 809, 467 P.2d 537], our Supreme Court explained the role of an election official in determining whether a signature on a referendum petition is valid: "These duties are ministerial but they are not mechanical. They involved more than a computation of the number of signatures. Some judgment on the part of the [election official] is required. Each signature on the petition must be handwritten and [the election official] must compare this handwriting with that on the registration affidavit to determine if it is the handwriting of the voter. [The official] must use . . . eyesight and critical faculties to determine whether sufficient similarities exist . . . to certify that this is a valid signature. If [the official] certifies that the petition contains the requisite number of valid signatures, . . . [that decision] is therefore prima facie correct. It is not conclusive, however, and may be challenged and reviewed by a court in mandamus proceedings. [Citation.] [¶] . . . [¶] . . . Where the signature on the petition is obviously spurious and is not that of the voter as shown by the registration affidavit, the [official] may and must reject it. [The official] has no discretion to certify a spurious signature. Where there are dissimilarities which are so minor as to make . . . rejection of the signature an unreasonable or arbitrary act, the court may not accept the [official's] determination. Where . . . the dissimilarities are not so minor and the similarities are not so great that only one conclusion can be made as to the validity or invalidity of the signature, and where the court finds that in acting upon these dissimilarities and other indicia the [official] was not acting unreasonably or arbitrarily . . . , the court must accept the [official's] determination." (*Id.* at pp. 455–456; see Evid. Code, § 664.)[5]

---

[4] Subsequent statutory references are to the Elections Code unless otherwise indicated.

[5] Although the *Wheelright* court did not cite the presumption of Evidence Code section 664 that official duty has been regularly performed, the tenor of the opinion is fully compatible with decisions antedating enactment of the Evidence Code indulging that presumption in favor of election officials. (*Mead v. City of Los Angeles* (1921) 185 Cal. 422, 426 [197 P. 65];

■ The role of the election official is meant to be as impersonal as possible. There is to be no concern with whether a referendum "will be valid if enacted." (*Farley v. Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650].) "If the person signing the petition has registered and has subscribed to the required affidavit, he [or she] may sign the petition, and the [election official] has no power to disqualify him [or her] by reason of a conjecture on his [or her] part, or by reason of information gained from other than the registration records . . . . Any other rule might result in depriving a major portion of their right to sign such petitions, and this we are not inclined to sanction." (*Ley v. Dominguez* (1931) 212 Cal. 587, 596 [299 P. 713].) The role of an election official has been repeatedly described as purely ministerial, involving no exercise of discretion. (See *Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 132–133 [133 Cal.Rptr.2d 249] and authorities cited.)

As is evident from its written decision, the trial court was obliged by Friends' trial strategy to conduct a detailed examination of the petitions examined by Slocum and Gomez. However, the claim of error we shall address does not require this court to repeat that examination, because it presents a pure issue of law.

## II

Friends' appeal asserts error in connection with five categories of signatures invalidated by the election officials, the first of which contends that "Slocum acted unreasonably in invalidating those signatures where a second person apparently wrote the signer's name and address." As Friends explains: "The single largest category of contested signatures is thirty-six signatures where, based on handwriting and other factors, it appears a second person assisted the signer by writing their name and address. Slocum invalidated all 36 such signatures. This . . . in spite of Elections Code § 100.5, which provides that a second person can write the name and address for a voter who is unable to do so, as long as the signature is underwritten by one witness. Friends contends that the completed declaration of circulator at the end of each petition section satisfied this requirement. [The trial court] rejected this argument and affirmed Slocum's actions." Friends is wrong. The trial court was right.

*Powers v. Hitchcock* (1900) 129 Cal. 325, 327–328 [61 P. 1076]; *Biffle v. Social Welfare Board* (1951) 104 Cal.App.2d 446, 451 [231 P.2d 869]; *Brown v. City Council* (1930) 103 Cal.App. 113, 115 [284 P. 254].)

The governing statutes all use plain language, and provide as follows:

"[W]henever any initiative, referendum, recall, nominating petition or . . . any other petition or paper, is required to be signed by voters . . . , only a person who is an eligible registered voter at the time of signing the petition or paper is entitled to sign it. Each signer shall at the time of signing the petition or paper personally affix his or her signature, printed name, and place of residence, giving street and number, and if no street or number exists, then a designation of the place of residence which will enable the location to be readily ascertained. A space at least one inch wide shall be left blank after each name for the use of the elections official in verifying the petition or paper. . . ." (§ 100.)

"Notwithstanding Section 100, a voter who is unable to personally affix on a petition or paper the information required by Section 100 may request another person to print the voter's name and place of residence on the appropriate spaces on the petition or paper, but the voter shall personally affix his or her mark or signature on the appropriate space of the petition or paper, which shall be witnessed by one person by subscribing his or her name thereon." (§ 100.5.)

"Wherever any petition or paper is submitted to the elections official, each section of the petition or paper shall have attached to it a declaration signed by the circulator of the petition or paper, setting forth, in the circulator's own hand, . . . [¶] . . . [¶] That the circulator circulated that section and witnessed the appended signatures being written. . . ." (§ 104, subds. (a), (b)(1).)

"For purposes of verifying signatures on any . . . referendum . . . petition . . . , the elections official shall determine that the residence address on the petition . . . is the same as the residence address on the affidavit of registration. If the addresses are different, . . . or, in the case of an initiative or referendum petition, if the information specified in Section 9020 is not contained in the petition, the affected signature shall not be counted as valid."[6] (§ 105.)

---

[6] Section 9020 provides in pertinent part: "The petition sections shall be designed so that each signer shall personally affix all of the following: [¶] (a) His or her signature. [¶] (b) His or her printed name. [¶] (c) His or her residence address, giving street and number, or if no street or number exists, adequate designation of residence so that the location may be readily ascertained. [¶] (d) The name of his or her incorporated city or unincorporated community. [¶] Only a person who is a qualified registered voter at the time of signing the petition is entitled to sign it. . . . "

Friends is not challenging any part of any decision that involves examining the record for substantial evidence, that is, it does not contest the conclusions of Gomez and Slocum that the 36 signatures were in fact written by others. Rather, Friends' contention presents a pure issue of law—whether the trial court correctly upheld the respective decisions made by Slocum and Gomez disallowing ostensible voter signatures that were in fact made by someone else but lacked any information about the witnessing person alongside each signature.

 In considering the requirement of section 100 that each signatory must "personally affix" a printed name and address, the Sixth District stated: "The requirement . . . is neither redundant [to checking whether the signature was valid] nor insignificant. Both the additional attention of the signer (who must 'personally affix' the information) and the result (the additional ability to verify that the signer was actually involved in the process) aid in preventing forgery and other potential abuse. [Citations.] In addition, the requirement that the signer 'personally affix' the information ensures that the signer, at the time of signing, has actually affirmed the residence address placed on the petition. This affirmation goes to the very heart of the process—the Registrar's ability to verify whether those who signed the petition were entitled to do so. [Citation.]" (*Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 270 [73 Cal.Rptr.2d 602].)

 This reasoning is equally sound when considering the demands of section 100.5. If a signer is unable to "personally affix his or her signature, printed name, and place of residence" as required by section 100, it is obvious that an additional safeguard was believed necessary. And this the Legislature provided, by requiring that when each such voter "shall personally affix his or her mark or signature on the appropriate space of the petition or paper" it "shall be witnessed by one person . . . subscribing his or her name thereon." With this requirement, section 100.5 specifies a mechanism that is an obvious aid to election officers in verifying the voter's information. A city or county registrar would have the specific name of the person who actually sees "the voter's name and place of residence on the appropriate spaces" written on the petition at the voter's request. Having that information is patently relevant to the ability of election officers to verify the signature or mark of a voter who could not, for whatever reason, write out the information personally.[7] No such witness signatures are present here—a defect, we hold, that is not cured by the circulator's verification of each section of the petition.

---

[7] In its brief, Friends states that "In the stipulated facts submitted to the trial court, the parties stipulated that all the signatures involved were such 'assisted' signatures." The most relevant part of the stipulated facts is paragraph No. 11, quoted above. It does not establish that the signatures in this contested category were in fact "assisted," and both Slocum and Bay Meadows Land Company take issue with Friends' characterization.

As noted above, the law requires that "[w]herever any petition . . . is submitted to the elections official, each section of the petition . . . shall have attached to it a declaration signed by the circulator of the petition . . . , setting forth, in the circulator's own hand, . . . [¶] That the circulator circulated that section and witnessed the appended signatures being written. . . ." (§ 104, subds. (a), (b)(1).) Such declaration must appear on every referendum petition, which declaration counsel for both Bay Meadows Land Company and Slocum characterize as the "generic declaration" of the circulator. And, they assert, such declaration cannot substitute to satisfy the more personalized requirements of section 100.5. We agree.

If the Legislature intended to permit a circulator to endorse all "assisted" signatures, it could readily have done so by employing language similar to that found in section 104. But it did not, and chose to provide that the voter's "mark or signature . . . shall be witnessed by [a] person"—not by "the circulator of the petition or paper." The irrefutable logic behind that choice is that the voter, and the person who witnessed someone other than the voter write out the voter's information at the voter's request, would be more reliable sources of verification than a circulator who might have a far less precise—if any—recollection of each and every signatory.

■ As is apparent from the above, the Legislature drew a clear distinction among "circulators," "voters," and "persons." If we accepted Friends' construction, we would in effect be amending the language of section 100.5 to conform to an unexpressed legislative intent. That is beyond the judicial competence. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75 [124 Cal.Rptr.2d 519, 52 P.3d 695]; *Seaboard Acceptance Corp. v. Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882].) Likewise, acceding to Friends' construction would make the plain language of section 100.5 surplusage to the way Friends would like section 104 to read. But we must deal with section 104 with the language enacted by the Legislature. Significantly, that language requires only that the circulator declare that he or she witnessed the signatures as they were written. It does not require the circulator to state by whom the other information required by sections 100 and 9020 came to be on the petition.

Our conclusion is supported by the legislative history, as demonstrated by Friends' own brief. There, discussing the Senate Committee on Elections, Reapportionment and Constitutional Amendments report on Assembly Bill No. 1520 (2001–2002 Reg. Sess.) section 2, the bill that amended section 100.5, Friends quotes as follows: "Current law requires two witnesses to be

present to verify a 'mark' signature. In some cases, it may be difficult or impossible for someone with a physical impairment to locate two witnesses to verify their signature for their absentee ballot or petition. For these individuals, it would be more convenient to require one witness *since it is assumed that they would likely have an in-home-care assistant or family to attend them.*" (Italics added.) Such comment makes clear that the witness be someone other than the circulator of a petition.

Friends proffers another reading of section 100.5, this focusing on the statute's language that "the voter shall personally affix his or her mark or signature on the appropriate space of the petition or paper, which shall be witnessed by one person by subscribing his or her name thereon." According to Friends: "Read in context, 'thereon' obviously refers to the petition or paper, not the space for the voter's signature." The weakness of this proposed construction can be shown with two questions if Friends' interpretation were correct: (1) Where on the petition or paper would a person, other than the circulator, who witnessed the voter's request and the ensuing assisted signature "subscrib[e] his or her name"? (2) Just how would an election officer reviewing a petition know which signatures were assisted and which were not? In sum and in short, Friends' proposed construction would frustrate the security of the referendum process, and would produce absurd consequences we cannot assume were intended by the Legislature. For these reasons, Friends' construction must be rejected. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876]; *Flannery v. Prentice* (2001) 26 Cal.4th 572, 578 [110 Cal.Rptr.2d 809, 28 P.3d 860].)

■ Lastly, Friends' proposed construction of section 100.5 cannot be reconciled with another provision of the Elections Code that deals with the subject. In subdivision (a) of section 354.5, the Legislature defined "signature" as "includ[ing] a person's mark if the name of the person affixing the mark is written near the mark by a witness over the age of 18 years designated by the person and the designee subscribes his or her name as a witness thereto." The unmistakable import of this definition is that a subscribing witness's name is to be "near" the mark made by a voter. This statutorily required proximity cannot be reconciled with the way Friends would construe section 100.5. A circulator's declaration is not even required to be on the same page as voter signatures, only to be "attached" to "the petition or paper." (§ 104, subd. (a).) Because sections 100.5 and 354.5 address the same subject, they must be read in light of each other. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 248, 255 [127 Cal.Rptr.2d 177, 57 P.3d 654]; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778 [38 Cal.Rptr.2d 699, 889 P.2d 1019].)

██ As noted above, Friends does not contest the conclusions of Gomez and Slocum that the 36 signatures were in fact written by others. Thus, the only issue presented is whether those officials properly enforced sections 100 and 100.5 according to their plain language. The trial court concluded they did. We agree with that conclusion, and hold that there was no error in the trial court's refusal to overturn the decision of the responsible election officials disallowing the 36 so-called "assisted" signatures. (See *Wheelright v. County of Marin, supra,* 2 Cal.3d 448, 455–456.)

## III

The numbers are dispositive. Friends needed 4,661 valid voter signatures to get the referendum on the ballot. Friends produced 4,577 signatures that Slocum accepted as valid. Therefore, Friends was 84 signatures short. The trial court found that three of the submitted signatures should not have been invalidated, and added 25 more for the petition Slocum was held to have erroneously not considered. Still, Friends was 56 signatures short, and would thus have to prevail on 56 of the 67 votes it challenges on its appeal. However, as discussed in part II, *ante,* the trial court correctly upheld the decision to disallow the group of 36 signatures. Friends is otherwise contesting only 31 other disqualified signatures. Even were Friends to prevail as to these 31 voters, it would still fall short of the 4,661 signatures needed.

██ This is a classical instance of mootness: " 'An appellate court will not review questions which are moot and which are only of academic importance. It will not undertake to determine abstract questions of law at the request of a party who shows that no substantial rights can be affected by the decision either way.' " (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1366 [263 Cal.Rptr. 214].) Having already determined that the judgment may be affirmed, deciding additional grounds which cannot change that result qualifies as academic. Resolving the additional arguments made by Friends will change nothing.

As previously mentioned, the City and Gomez filed their own "cross-appeal" from the judgment in the Friends case. The object of their appeal is the trial court's finding that Gomez "acted improperly in rejecting one petition section, when the contents of the petition clearly indicated it had not been circulated outside of the legally mandated time period." The preceding discussion established that the judgment can be affirmed on the ground that the trial court correctly determined that Friends failed to secure the requisite number of signatures. If the finding objectionable to the City and Gomez

were to be examined and found defective, it would merely be an additional reason why Friends would not be entitled to any relief against the judgment, another ground for a conclusion already reached. So, if the issue argued by the City and Gomez is not decided, it will not disadvantage them. They will not be aggrieved (Code Civ. Proc., § 902), and their substantial rights will not be impaired if they do not get what amounts to an advisory opinion. (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717] [reviewing court will not " ' "give opinions . . . or . . . declare principles or rules of law which cannot affect the . . . case before it." ' "].) In sum, the City and Gomez's "cross-appeal" is moot, and it must be dismissed. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind, supra,* 67 Cal.2d 536, 541; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 642, pp. 669–670.)[8]

Counsel for Flecker and Bay Meadows Land Company, the appellants in appeal No. A115503, state on the first page of their well-reasoned and scholarly brief: "In this case, the trial court rejected appellants' challenges to both the validity of the referendum itself and the referendum petition. In the other case, *Friends of Bay Meadows, et al. v. City of San Mateo,* No. A115674 . . . , the trial court upheld the decision of election officials that the referendum proponents did not obtain sufficient valid signatures to qualify the measure for the ballot. If this Court affirms the trial court's ruling in that case, it will not need to reach the issues presented by this appeal—*i.e.,* the validity of the referendum and the referendum petitions." In light of our decision to affirm in No. A115674, counsel's remarks concede that the appeal in No. A115503 is also moot—a concession confirmed at oral argument.

## DISPOSITION

In appeal No. A115674, the judgment is affirmed. The cross-appeal of the City of San Mateo and City Clerk Norma Gomez is dismissed as moot. Costs on appeal shall be recovered by respondent County of San Mateo Chief Elections Official Warren Slocum and by intervener Bay Meadows Land Company, Inc.

---

[8] There are exceptional circumstances when a reviewing court may, as a matter of discretion, decide an issue that ordinarily would be moot. (*White v. Davis* (2003) 30 Cal.4th 528, 537 [133 Cal.Rptr.2d 648, 68 P.3d 74]; *People v. Cheek* (2001) 25 Cal.4th 894, 897–898 [108 Cal.Rptr.2d 181, 24 P.3d 1204].) Neither Friends nor the City and Gomez invoke this principle, nor do they point to the presence of any exceptional circumstances that justify relaxing the rule against mootness. No exceptional circumstances occur to us.

In appeal No. A115503, the appeal of Suzanne Flecker and Bay Meadows Land Company, Inc., from the judgment is dismissed as moot. All parties to this appeal shall bear their respective costs.

Kline, P. J., and Haerle, J., concurred.